SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Michael J. Thieme v. Bernice F. Aucoin-Thieme** (A-51-15) (076683)

**Argued September 26, 2016 -- Decided December 12, 2016**

**Patterson, J., writing for a unanimous Court.**

In this appeal, the Court construes New Jersey's equitable distribution statute, N.J.S.A. 2A:34-23(h) and -23.1, and considers the equitable remedy of a constructive trust, in the setting of a post-judgment dispute with respect to deferred compensation.

In 1999, plaintiff Michael J. Thieme (Thieme) began employment at a biometrics consulting firm. He worked over ninety hours a week and frequently traveled for his job. In late 2000 or early 2001, Thieme met defendant Bernice F. Aucoin-Thieme (Aucoin-Thieme). In May 2002, Aucoin-Thieme discovered that she was pregnant, and she and Thieme began to cohabitate. Their daughter was born in January 2003.

Although Thieme held no ownership interest in the firm, the firm's principals offered to compensate him for his contributions to the firm's success, in the event that they sold the firm. Thieme and Aucoin-Thieme determined that, given the demanding nature of Thieme's schedule, Aucoin-Thieme would not pursue employment, but rather would care for their daughter, maintain their residence, and manage their rental properties.

The couple's relationship was volatile from its inception, and Thieme and Aucoin-Thieme would frequently exchange angry emails. At the end of one such exchange in 2010, Thieme explicitly acknowledged in an email that Aucoin-Thieme had given up her own career and educational aspirations so that Thieme could pursue his—which Thieme described as a "great sacrifice"—and noted that "it is appropriate that I support you fully in recognition of this sacrifice." Later that year, Thieme and Aucoin-Thieme wed. They filed for divorce fourteen months later. In the course of negotiations about the division of their assets, Thieme reiterated his view that Aucoin-Thieme would be entitled to a portion of any bonus he received upon the sale of the firm.

In April 2012, Thieme and Aucoin-Thieme executed their Property Settlement Agreement. Three months after the entry of their judgment of divorce, the firm was sold and Thieme was offered a one-time Closing Bonus of $2,250,000. Thieme did not inform Aucoin-Thieme of the Closing Bonus. She first learned of the Bonus when Thieme deposited $200,000 into a bank account that, unbeknownst to Thieme, remained a joint account despite the divorce. With no notice to Thieme, Aucoin-Thieme withdrew the deposited funds. Thieme filed a complaint.

After a three-day bench trial, a Family Part judge determined that Thieme earned the Closing Bonus over his entire employment with the firm and that Aucoin-Thieme was entitled to thirty percent of the post-tax portion of the Bonus earned during their fourteen-month marriage. The court awarded $30,288, to Aucoin-Thieme and ordered her to return the remaining amount that she had withdrawn from the joint account, totaling $169,712, to Thieme.

Aucoin-Thieme appealed, asserting that she was also entitled to a share of the Closing Bonus for the period during which she cohabitated with Thieme prior to marriage under both the equitable distribution statute and equitable theories including unjust enrichment and constructive trust. In an unpublished opinion, an Appellate Division panel affirmed the trial court's judgment, substantially for the reasons stated by the trial judge.

The Court granted Aucoin-Thieme's petition for certification. 224 N.J. 245 (2016).

**HELD**: N.J.S.A. 2A:34-23(h) authorizes the equitable distribution of Thieme's Closing Bonus only to the extent that the compensation was earned during the parties' marriage because, under that statute, the property to be divided is that which was earned, or otherwise acquired, during a marriage or civil union. The Court holds, however, that the extraordinary circumstances of this case warrant the imposition of a constructive trust as a remedy for Aucoin-Thieme's

1

claim of unjust enrichment and that Aucoin-Thieme is entitled to a percentage of the portion of the Closing Bonus earned during the parties' cohabitation.

1. The equitable distribution statute authorizes the Family Part to distribute assets "in all actions where a judgment of divorce, dissolution of civil union, divorce from bed and board or legal separation from a partner in a civil union couple is entered." N.J.S.A. 2A:34-23(h). The statute reflects the public policy recognition that marriages and civil unions are joint undertakings similar to partnerships. (pp. 17-18)

2. The equitable distribution statute does not govern disputes over property between parties who have cohabited but have never entered into a marriage or civil union, nor does it treat property acquired during a period of cohabitation prior to a marriage or civil union as equivalent to property acquired during that marriage or civil union. (pp. 19-22)

3. The Court agrees with the trial court and Appellate Division that if the portion of Thieme's Closing Bonus that was earned prior to the marriage were held to be a marital asset, such a ruling would contravene the plain language of N.J.S.A. 2A:34-23(h). The Court holds that the trial court correctly allocated the distribution of Thieme's Closing Bonus to premarital and marital periods, and properly deemed only the portion of the compensation that was earned during the parties' marriage to be a marital asset subject to equitable distribution. (pp. 22-23)

4. Having rejected Aucoin-Thieme's claim for equitable distribution of the portion of the Closing Bonus allocated to the period prior to the parties' marriage, the Court turns to her claims based on equitable principles. The Court notes that the Family Part is a court of equity, and that "[e]quities arise and stem from facts which call for relief from the strict legal effects of given situations." Carr v. Carr, 120 N.J. 336, 351 (1990). (pp. 23-24)

5. To prove a claim for unjust enrichment, a plaintiff must demonstrate that the defendant received a benefit and that it would be unjust for the defendant to retain that benefit without compensating the plaintiff. In the event that a court finds unjust enrichment, it may impose a constructive trust. (pp. 24-25)

6. In Carr, the plaintiff's statutory claim that she was entitled to the equitable distribution of assets owned by her husband failed because the husband died during their protracted divorce proceedings, such that no judgment of divorce was entered. Notwithstanding this failure, the Court affirmed the imposition of the equitable remedy of constructive trust because the estate's retention of "the share beneficially belonging to Mrs. Carr" could give rise to unjust enrichment. Carr, supra, 120 N.J. at 353-54. (pp. 25-27)

7. The principles expressed in Carr apply with equal force to this appeal and warrant the imposition of a constructive trust governing a portion of Thieme's Closing Bonus in the unusual circumstances of this case. The firm's acknowledgment that Thieme would be generously compensated upon the sale of the company was a significant factor in the parties' personal and financial planning from the early stages of their relationship. Thieme firmly opposed any suggestion that he pursue less demanding employment and take on a more active role in their daughter's care so that Aucoin-Thieme could seek a job. Aucoin-Thieme's efforts enabled Thieme to focus almost exclusively on the firm, and thus supported his career. Indeed, Thieme himself explicitly recognized that Aucoin-Thieme's contributions to their family should be rewarded and that his obligation to financially support Aucoin-Thieme implicated, to some extent, any compensation that he would receive if the company were sold. (pp. 27-30)

8. Under these facts, a decision constraining Aucoin-Thieme to the nominal share of the Closing Bonus that is authorized by the equitable distribution statute would result in unjust enrichment. As a remedy, a percentage of the portion of the Closing Bonus that was earned by Thieme during the period in which the parties cohabited prior to their marriage should be deemed to be held by Thieme in constructive trust for Aucoin-Thieme. The Court directs the trial court on remand to determine the specifics of that constructive trust. (pp 30-31)

The judgment of the Appellate Division is **AFFIRMED IN PART** and **REVERSED IN PART**, and the matter is **REMANDED** to the Family Part for proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE PATTERSON's opinion.**

2

MICHAEL J. THIEME,

    Plaintiff-Respondent,

       v.

BERNICE F. AUCOIN-THIEME,

    Defendant-Appellant.


        Argued September 26, 2016 – Decided December 12, 2016

        On Certification to the Superior Court,
        Appellate Division.

        Michael J. Confusione argued the cause for
        appellant (Hegge & Confusione, attorneys).

        Linda M. Coronato argued the cause for
        respondent.

    JUSTICE PATTERSON delivered the opinion of the Court.

    In this appeal, the Court construes New Jersey's equitable distribution statute, N.J.S.A. 2A:34-23(h) and -23.1, and considers the equitable remedy of a constructive trust, in the setting of a post-judgment dispute over deferred compensation.

    Plaintiff Michael J. Thieme (Thieme) and defendant Bernice F. Aucoin-Thieme (Aucoin-Thieme) were briefly married after an eight-year cohabitation. Before and during the marriage, Thieme was a salaried employee of a biotechnology consulting business, International Biometrics Group (IBG). Although Thieme had no

ownership interest in IBG, its principals committed in writing to compensate him for his contributions to IBG's success, in the event that they sold their company. Thieme and Aucoin-Thieme made personal and financial decisions with the expectation that if IBG were sold, Thieme would receive substantial compensation. Thieme worked long hours and traveled extensively on IBG's behalf; Aucoin-Thieme devoted her attention to their child and home and did not seek employment. IBG, however, was not sold during the parties' marriage.

When Thieme and Aucoin-Thieme divorced, they agreed upon the terms of a Property Settlement Agreement (PSA), and their assets were divided in accordance with its terms. Three months after the Family Part's entry of a judgment of divorce, IBG was sold. IBG paid Thieme $2.25 million, characterized as a "Closing Bonus" (the Closing Bonus or the Bonus), granted in compensation for his contributions to the business for more than a decade of service.

In post-judgment proceedings before a Family Part judge, Aucoin-Thieme sought a share of the Closing Bonus. After a bench trial, the trial judge ruled that Aucoin-Thieme was entitled to equitable distribution; however, the equitable distribution was limited to the portion of Thieme's Closing Bonus that was attributable to his work during the parties' marriage and excluded any share of the remainder of that

2

compensation.  The Appellate Division affirmed the trial court's determination.

We affirm in part and reverse in part the Appellate Division's judgment.  We concur with the trial judge and the Appellate Division that N.J.S.A. 2A:34-23(h) authorizes the equitable distribution of Thieme's Closing Bonus only to the extent that the compensation was earned during the parties' marriage.  We hold, however, that the extraordinary circumstances of this case warrant the imposition of a constructive trust as a remedy for Aucoin-Thieme's claim of unjust enrichment, and that Aucoin-Thieme is entitled to a percentage of the portion of the Closing Bonus that Thieme earned during the parties' cohabitation.  We remand this case to the trial judge for an allocation of the deferred compensation.

I.

We derive our summary of the facts from the trial record.

In 1999, Thieme was hired by a longtime friend, Raj Nanavati, to be the first employee of IBG, a company that Raj Nanavati founded with his brother, Samir Nanavati.  IBG was a start-up biometrics consulting firm.  It provided security services, including fingerprinting and facial identification technology, to businesses.  Thieme began his employment with IBG as a consultant and later was assigned the title "Director of Special Projects."

From the inception of his employment at IBG, Thieme worked "non-stop" for the company; he devoted between ninety and one hundred hours per week to his job. He traveled to sixty countries in the course of his employment and was away from home for extended periods. Thieme was not given stock or any other ownership interest in the company. He was initially paid a salary of approximately $40,000 per year, and his salary eventually reached $180,000 per year.

Aucoin-Thieme was a resident of Mississippi, working for a rental car company, when she was introduced to Thieme by his sister in late 2000 or early 2001. A few months later, Aucoin-Thieme moved to Jersey City, where she temporarily lived in an apartment that Thieme shared with his sister. Aucoin-Thieme and Thieme began dating. During that period, Aucoin-Thieme held a series of jobs in retail businesses.

In May 2002, Aucoin-Thieme discovered that she was pregnant. According to Aucoin-Thieme, she and Thieme put money aside for a wedding that would follow their child's birth, but delayed their marriage because they needed to spend the money on other priorities. Thieme testified that they discussed marriage only "in the abstract" at that time, and made no definite plans. They moved into an apartment in Jersey City shortly after they learned of Aucoin-Thieme's pregnancy.

4

That month, Thieme approached IBG's owners about his position and compensation at the company. He drafted and sent to IBG's owners a document entitled "Statement of Understanding," which provided:

> It is the intention of Raj Nanavati and Samir Nanavati, partners of International Biometric Group, LLC, that Michael Thieme, Director of Special Projects, be provided with remuneration and compensation commensurate with his past and present role in the execution and delivery of IBG products and services, enabling company revenue and employee growth, and enhancing IBG's position as the industry's leading provider of biometric consulting and integration services.
>
> Such remuneration and compensation will be above and beyond monies already paid in the form of regular salary and bonus.
>
> The form and relative amount of remuneration and compensation are to be determined at a later date, and are anticipated to be commensurate with Mr. Thieme's relative value to IBG since his employment in November 1999, reflective of the unwritten and non-explicit agreement between Mr. Thieme and Raj Nanavati and Samir Nanavati to this effect.
>
> This remuneration and compensation may take the form of an equity position in IBG, or in a company or venture principally formed through, with, or by IBG, prior or subsequent to acquisition, liquidation, major partnership, or substantive change in ownership or corporate structure. In lieu of any such development, this remuneration and compensation may also take the form of salary or other tangible method of compensation.

> A copy of this statement will be placed in Mr. Thieme's permanent employee file.[1]

Raj Nanavati testified that he and his brother executed the Statement of Understanding with the "understanding if we sell the company, or cash out, we will take care of [Thieme]. We will give [Thieme] something extra." Thieme, however, testified that he considered the Statement of Understanding to be unenforceable because it did not quantify the proposed compensation. Thieme and Aucoin-Thieme dispute whether Aucoin-Thieme was aware of the Statement of Understanding during that period; he contends that he informed her about it, and she denies that he did so.

Shortly thereafter, Aucoin-Thieme left her retail position. She testified that she did so because she was concerned about the impact of her job and long commute on her pregnancy. The parties' daughter was born in January 2003.

Before and after their child's birth, the parties discussed the division of responsibilities in their personal and professional lives. Although Aucoin-Thieme hoped to pursue a career, Thieme and Aucoin-Thieme agreed that she would not seek a job outside the home, but would take care of their daughter

---

[1] The record contains only an unsigned copy of the "Statement of Understanding." Thieme testified that he did not know whether the document was signed; Raj Nanavati testified that he recalled "signing a document in around . . . 2000, early 2000." No signed version was presented to the trial judge.

and maintain their residence, as he continued to work on a demanding schedule. Thieme characterized this agreement as a "trade off" that enabled the parties to live on his salary, in light of their shared view that his earning capacity substantially exceeded hers. He recalled that the parties agreed that a return to work would not be cost-effective for Aucoin-Thieme because, if she obtained a job, they would incur significant expenses for child care. With the exception of a brief per diem job as a substitute teacher at her daughter's preschool, Aucoin-Thieme was not employed outside the home after the birth of the child.

According to Aucoin-Thieme, in addition to caring for her daughter and performing nearly all of the household tasks, she conducted minor repairs on the home, paid the bills, and managed the parties' rental properties. The parties dispute the extent of Aucoin-Thieme's assistance in the advancement of Thieme's career. She contends that she actively participated in social activities connected with his job, and he denies that his employment involved significant social obligations.

In 2006, IBG's owners conducted what Thieme characterized as "very preliminary discussions" with a biometric vendor about the potential sale of the business. According to Aucoin-Thieme, Thieme told her at that time that he had a contract that would entitle him to share in the proceeds of any sale, and the

7

parties bought a new home in anticipation of that compensation. The discussions, however, did not lead to a sale of IBG. Shortly thereafter, Thieme, Aucoin-Thieme, and their daughter moved to Virginia so that Thieme could oversee an important government contract for IBG.  They remained in Virginia for approximately three years and moved back to New Jersey in 2009.

The parties' relationship, volatile from its inception, deteriorated following their return to New Jersey.  The primary focus of their dispute was Thieme's employment at IBG.  Aucoin-Thieme resented Thieme's work hours and disliked the owners of the company.  At various times, Thieme and Aucoin-Thieme accused one another of verbal and physical abuse, often using e-mail to exchange angry communications.

At the conclusion of a series of acrimonious e-mails written in July 2010, Thieme wrote:

> This email is an acknowledgment that you have had to give up your career and educational aspirations in order to stay at home with [our daughter] while I worked and pursued my career. You have put your career aside so I could advance mine.  I understand that this has been a great sacrifice for me and for our family. I also understand that in the future, regardless of our circumstances, it is appropriate that I support you fully in recognition of this sacrifice.

In an e-mail discussion about a potential settlement of their dispute with the assistance of legal counsel, written after Aucoin-Thieme threatened to move to Mississippi with their

8

daughter, Thieme advised Aucoin-Thieme that her counsel would "be shocked as to how much money I will give you," but that he needed "to have the situation with my daughter resolved."

Notwithstanding their frequent discord and vitriolic e-mail exchanges, Thieme and Aucoin-Thieme married in August 2010. Although the parties agree that their marriage began on a positive note, their relationship worsened shortly after their wedding. According to Thieme, Aucoin-Thieme's demands that he shorten his hours and respond immediately to e-mail messages that she sent to him during the workday imperiled his job at IBG.

The parties' conflict reached a critical point in October 2011. In the wake of a dispute over e-mails that Thieme exchanged with a co-worker, Aucoin-Thieme sent a series of inflammatory e-mails about Thieme to IBG's owners and employees. In the e-mails, Aucoin-Thieme contended that she had a video of an altercation between the two in the presence of their daughter. She called the company's owners disparaging names and demanded that they pay her money that she insisted was owed to her. Aucoin-Thieme then sent an e-mail to Thieme, asking whether he was "ready to give [her] a divorce" in the wake of that episode.[2]

_____

[2] At trial, Aucoin-Thieme testified that when she sent that e-mail, she was under the mistaken impression that New Jersey law

Only fourteen months after the parties' wedding, Thieme filed a complaint for divorce in the Family Part. With the assistance of counsel, Thieme and Aucoin-Thieme negotiated the equitable distribution of their assets, alimony, child support, and the custody of their child.

During their negotiations, the parties communicated by e-mail about the prospect that IBG would pay deferred compensation to Thieme. Thieme advised Aucoin-Thieme that he did not "expect to get any large lump-sum bonuses," but that "if some magical $50K bonus appeared, then I'd wind up clearing $30K, and we can make some arrangement - e.g. split it 50/50?" A week later, Thieme confirmed to Aucoin-Thieme that, notwithstanding their "discussions . . . about me someday getting an ownership stake [in IBG]," he had "no idea if it will ever happen, or how it will be structured, or the value." He added that IBG's grant of an ownership interest "may never happen. It will certainly not happen anytime soon." In another e-mail, Thieme added that any stake in IBG awarded to him "would be defined, probably, as stocks," and that he did not anticipate "a big cash payment."

Thieme also asked Aucoin-Thieme to identify what she considered to be her fair percentage share of any "potential income/assets I make if I ever accept a buyout[.]" Aucoin-

authorized one spouse to bar another spouse from obtaining a divorce.

10

Thieme did not commit to any specific percentage. Again by e-mail, Thieme stated that although there had been no discussions of a sale of IBG since 2006, he viewed Aucoin-Thieme's claim to his assets to date back to the time of their daughter's birth. He reiterated his view that IBG would not be sold "soon," but again asked her to quantify her claim to "a future ownership stake" in the company. She did not do so.

A month later, Thieme urged Aucoin-Thieme not to delay the settlement of their dispute "based on something that may never happen." He reassured her that if he were awarded "ownership in IBG" in the future, "we are going to need to revisit" the issue. Thieme reiterated that he had no contract with IBG; he represented that there was "absolutely nothing at all stating that I am going to ever get any part of" the company. He suggested that the parties discuss the issue later, in the event that he acquired an interest in IBG.

In April 2012, Thieme and Aucoin-Thieme executed their PSA. Pursuant to its terms, the parties evenly divided their identified assets -- whether those assets were acquired during their lengthy period of cohabitation or their brief marriage -- and resolved issues of alimony, child support, and visitation. The PSA provided that neither party owned "any businesses or any interests whatsoever in any businesses which are subject to equitable distribution" and that the agreement had no binding

11

effect on undisclosed assets. The PSA did not address any deferred compensation anticipated by the parties.

Shortly after the trial court entered a final judgment of divorce on June 20, 2012, Aucoin-Thieme moved to Mississippi with the parties' daughter. Thieme rented an apartment near Aucoin-Thieme's Mississippi home and spent time with the child in accordance with the visitation schedule set forth in the PSA.

Three months after the entry of the parties' judgment of divorce, IBG's owners entered into an agreement to sell IBG to another company. Shortly before the closing, Raj and Samir Nanavati executed a document offering Thieme the Closing Bonus, described as "a one-time bonus in the amount of $2,250,000" contingent on the closing of the sale. The document referenced the "Statement of Understanding" that was executed in 2002. IBG's owners represented that the Closing Bonus was offered pursuant to the Statement of Understanding, "to show our appreciation for [Thieme's] contributions in helping [IBG] grow into the successful organization that it is today."

In a deposition taken in this action, Raj Nanavati testified that IBG offered Thieme the Closing Bonus in accordance with the Statement of Understanding. He stated that the Closing Bonus was "[b]ased upon [Thieme's] contribution to the company over the 13 years[.]" He testified that Thieme was not told about the sale of IBG until the sale was completed.

12

It is undisputed that Thieme did not inform Aucoin-Thieme that IBG had awarded him the Closing Bonus. She first learned of the Bonus when Thieme deposited $200,000 into a bank account that, unbeknownst to Thieme, remained a joint account despite the divorce. With no notice to Thieme, Aucoin-Thieme withdrew the deposited funds from the joint account.

## II.

Thieme filed a complaint in the Chancery Court of Harrison County, Mississippi, Second Judicial Circuit. In addition to seeking the Mississippi court's intervention in a visitation dispute, Thieme asked the court to hold Aucoin-Thieme in contempt for withdrawing the contested funds from the bank account. Aucoin-Thieme filed a counterclaim. Among other claims, she alleged that Thieme committed fraud by failing to inform her, prior to the parties' divorce, that he would be receiving a substantial amount of money by virtue of IBG's sale. Aucoin-Thieme then relocated to New Jersey, and the Mississippi matter was transferred to the Family Part.

After discovery, a Family Part judge conducted a three-day bench trial addressing two related issues: whether Aucoin-Thieme was entitled to a share of Thieme's Closing Bonus, and whether she would be permitted to retain, or ordered to return, the $200,000 that she withdrew from the parties' joint account.

13

At the conclusion of the trial, the court determined that the Closing Bonus was earned by Thieme throughout his entire employment with IBG. The trial court found that Aucoin-Thieme was entitled to a share of that portion of the Closing Bonus that was earned by Thieme during the parties' fourteen-month marriage. It concluded, however, that Aucoin-Thieme was not entitled to equitable distribution of any portion of the Closing Bonus that was earned by Thieme during the period in which the parties cohabited prior to their marriage, because of N.J.S.A. 2A:34-23(h)'s limitation of equitable distribution to marital assets.

In accordance with its ruling, the trial court allocated the $2,250,000 Closing Bonus. It concluded that in the course of his employment, Thieme earned the Closing Bonus at a rate of $14,423 per month. Multiplying that amount by a factor of fourteen, the court ruled that during the parties' marriage, Thieme earned deferred compensation in the amount of $201,923. The trial court then determined that Thieme's net income from the allocated portion of his Bonus, after the deduction of taxes, was $100,961. It subjected that amount to equitable distribution under N.J.S.A. 2A:34-23.1, awarding thirty percent of that amount, or $30,288, to Aucoin-Thieme. The court ordered Aucoin-Thieme to return the remaining amount that she had

14

withdrawn from the joint account, totaling $169,712, to Thieme. It denied the parties' applications for attorneys' fees.

Aucoin-Thieme appealed the trial court's judgment. She contended that she was entitled to a share of the portion of the Closing Bonus that the trial court allocated to the years in which the parties cohabited prior to their marriage. She premised that claim on alternative theories: equitable distribution under N.J.S.A. 2A:34-23(h), and several common law claims seeking equitable relief, including unjust enrichment and constructive trust. In an unpublished opinion, an Appellate Division panel affirmed the trial court's judgment, substantially for the reasons stated by the trial judge.

We granted Aucoin-Thieme's petition for certification. 224 N.J. 245 (2016).

### III.

Aucoin-Thieme argues that the trial court improperly construed the equitable distribution statute, N.J.S.A. 2A:34-23.1, to authorize the distribution of only the portion of the Closing Bonus that was attributed to Thieme's work for IBG during the parties' marriage. Relying on the Appellate Division's opinions in Weiss v. Weiss, 226 N.J. Super. 281, 287 (App. Div.), certif. denied, 114 N.J. 287 (1988), and Berrie v. Berrie, 252 N.J. Super. 635, 646 (App. Div. 1991), Aucoin-Thieme argues that when cohabiting parties express their intention to

15

create a marital partnership prior to the marriage ceremony, premarital property acquired in "contemplation of marriage" should be subject to equitable distribution.  In the alternative, Aucoin-Thieme contends that she is entitled to a portion of the Closing Bonus under one or more quasi-contractual and equitable theories, such as quantum meruit, breach of implied contract, breach of joint venture, breach of partnership, unjust enrichment, and detrimental reliance.  Citing Carr v. Carr, 120 N.J. 336, 351 (1990), Aucoin-Thieme argues that her unjust enrichment claim warrants the remedy of a constructive trust.

Thieme counters that the trial court correctly concluded that N.J.S.A. 2A:34-23.1 authorizes equitable distribution based upon a marital relationship, and that any extension of the statute to cohabiting partners should be made by the Legislature, not by a court.  He contends that Weiss, supra, 226 N.J. Super. at 287-90, and Berrie, supra, 252 N.J. Super. at 644-48, are factually distinguishable from this matter.  Thieme argues that Aucoin-Thieme failed to prove the elements of her claims for equitable relief.

IV.

A.

We review the Family Part judge's findings in accordance with a deferential standard of review, recognizing the court's

16

"special jurisdiction and expertise in family matters." Cesare v. Cesare, 154 N.J. 394, 413 (1998). Thus, "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411-12 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

A more exacting standard governs our review of the trial court's legal conclusions. "Although a family court's factual findings are entitled to considerable deference, we do not pay special deference to its interpretation of the law . . . . [T]he trial court is in no better position than we are when interpreting a statute or divining the meaning of the law." D.W. v. R.W., 212 N.J. 232, 245 (2012) (citations omitted). Accordingly, we review the trial court's legal conclusions de novo. Id. at 245-46; see also N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 183 (2010) (citations omitted).

B.

We first review the trial court's determination that only the portion of Thieme's Closing Bonus attributed to the work that he performed during the parties' fourteen-month marriage was subject to equitable distribution, and that the remainder of the Bonus, earned prior to the marriage, was exempt from equitable distribution.[3]

---

[3] In light of the trial court's finding, undisputed on appeal, that the Closing Bonus compensated Thieme for his work during

17

The equitable distribution statute authorizes the Family Part to distribute assets "in all actions where a judgment of divorce, dissolution of civil union, divorce from bed and board or legal separation from a partner in a civil union couple is entered."  N.J.S.A. 2A:34-23(h).[4]  It reflects a public policy that is "at least in part an acknowledgment 'that marriage is a shared enterprise, a joint undertaking, that in many ways [] is akin to a partnership.'"  Smith v. Smith, 72 N.J. 350, 361 (1977) (quoting Rothman v. Rothman, 65 N.J. 219, 229 (1974)).  The statute clearly addresses the distribution of property only in the context of an action for divorce or the dissolution of a civil union.  N.J.S.A. 2A:34-23(h); see also Crowe v. De Gioia, 90 N.J. 126, 132 (1982) (finding that N.J.S.A. 2A:34-23 "does not embrace an action on a contract between unmarried cohabitants," and "[t]he Legislature has proscribed common law

_____

the period in which the parties cohabited and during their marriage, neither party contends that the provision of their PSA precluding claims to after-acquired property bars any distribution of a portion of the Closing Bonus to Aucoin-Thieme.

[4]  Applying the equitable distribution statute, a Family Part judge undertakes a three-step analysis.  Rothman v. Rothman, 65 N.J. 219, 232 (1974).  First, the court must "decide what specific property of each spouse is eligible for distribution"; second, it "must determine [the property's] value for purposes of such distribution"; and finally, it "must decide how such allocation can most equitably be made."  Ibid.  The statute sets forth a non-exhaustive list of factors for the court's consideration as it divides the parties' marital assets. N.J.S.A. 2A:34-23.1.

18

marriages"); <u>Kozlowski v. Kozlowski</u>, 80 <u>N.J.</u> 378, 383 (1979) (noting that equitable distribution statute then in effect authorized award "only in actions for divorce").[5]  Thus, the equitable distribution statute does not govern disputes over property between parties who have cohabited but have never entered into a marriage or civil union.  <u>Crowe</u>, <u>supra</u>, 90 <u>N.J.</u> at 132; <u>Kozlowski</u>, <u>supra</u>, 80 <u>N.J.</u> at 383.

The Legislature has limited the property that is subject to equitable distribution to "property, both real and personal, which was legally and beneficially acquired by them or either of them during the marriage or civil union."  <u>N.J.S.A.</u> 2A:34-23(h). Although the language "during the marriage or civil union" is not defined in the statute, it is unambiguous.  It is evident that the Legislature did not intend to treat property acquired during a period of cohabitation prior to a marriage or civil union as the equivalent of property acquired during that marriage or civil union, for purposes of equitable distribution. <u>N.J.S.A.</u> 2A:34-23(h).

---

[5]  In January 2010, the Legislature amended the Statute of Frauds to include "[a] promise by one party to a non-marital personal relationship to provide support or other consideration for the other party, either during the course of such relationship or after its termination," and to require that both parties have the benefit of legal counsel in arriving at such an agreement. <u>N.J.S.A.</u> 25:1-5(h).  <u>See generally</u> <u>Maeker v. Ross</u>, 219 <u>N.J.</u> 565, 580-82 (2014).  No claim governed by that provision has been made in this case.

"[T]he sole function of the courts is to enforce [the statute] according to its terms." Velazquez v. Jiminez, 172 N.J. 240, 256 (2002) (quoting Hubbard ex rel. Hubbard v. Reed, 168 N.J. 387, 392 (2001)). Accordingly, the property to be divided is that which was earned, or otherwise acquired, during the period in which the parties acted in pursuit of the shared enterprise of a marriage or civil union. See Smith, supra, 72 N.J. at 361.

Aucoin-Thieme relies on two Appellate Division decisions, Weiss, supra, 226 N.J. Super. at 287-90, and Berrie, supra, 252 N.J. Super. at 644-648, for the proposition that property acquired or earned prior to marriage may be subject to equitable distribution. In Weiss, supra, the divorcing spouses disputed the status of their marital home. 226 N.J. Super. at 284-85. The husband had purchased the home in his own name as the parties planned their wedding, and both parties remodeled the home prior to and after their marriage. Ibid. An Appellate Division panel affirmed the trial court's determination that the house was a marital asset, even though it was purchased prior to the parties' wedding. Id. at 289. The panel held that property acquired prior to marriage may be included in equitable distribution "where the parties have adequately expressed that intention and have acquired assets in specific contemplation of their marriage." Id. at 287. The panel applied the same logic

20

to the husband's business and remanded for an evaluation of any enhancement of the value in the husband's business, but only to the extent that the value increased during the parties' marriage.  Id. at 290.

In Berrie, supra, the contested asset was the increase in the value of the husband's stock in his business during the several years prior to the parties' marriage.  252 N.J. Super. at 637-38.  Before the parties married, the wife went to work for the business as a liaison to foreign trading partners.  Id. at 639-40.  The Appellate Division panel found that "[i]f the parties by their combined efforts work as part of [a marital] 'partnership' to increase the value of an asset held by one of them, such increase in value under established principles also might be subject to treatment as a partnership interest, which in turn might be subject to equitable distribution."  Id. at 646.  The panel determined that the increased value of the stock might constitute an asset "acquired [or, as here, enhanced] in specific contemplation of [the] marriage," and therefore be treated as a partnership interest.  Id. at 647 (alteration in original) (quoting Weiss, supra, 226 N.J. Super. at 287).  It remanded for the trial court's consideration of the nature and terms of the wife's premarital employment in the husband's business and other issues.  Id. at 648-49.

Neither Weiss nor Berrie supports Aucoin-Thieme's argument that the portion of Thieme's Closing Bonus that he earned prior to their marriage is subject to equitable distribution under N.J.S.A. 2A:34-23(h). Nothing in Weiss suggests that premarital compensation earned by a spouse is subject to equitable distribution; indeed, the Appellate Division panel in that case limited the wife's claim for equitable distribution of the increased value of the husband's business to the period during which the parties were married. Weiss, supra, 226 N.J. Super. at 289-90. In Berrie, supra, the Appellate Division heavily relied on the wife's direct contribution to the business as a key employee -- a contribution recognized as a "tremendous asset[]" in a certification executed by the husband. 252 N.J. Super. at 639. Neither Appellate Division opinion generally construes the equitable distribution statute to treat assets acquired prior to marriage as the equivalent of assets acquired during a marriage or civil union. Id. at 645-48; Weiss, supra, 226 N.J. Super. at 287-90. Any such construction would run afoul of the statute's terms.

We agree with the trial court and Appellate Division that if the portion of Thieme's Closing Bonus that was earned prior to the marriage were held to be a marital asset, such a ruling would contravene the plain language of N.J.S.A. 2A:34-23(h). We hold that the trial court correctly allocated the distribution

22

of Thieme's Closing Bonus to premarital and marital periods and properly deemed only the portion of the compensation that was earned during the parties' marriage to be a marital asset subject to equitable distribution.

                              C.

Our rejection of Aucoin-Thieme's claim for equitable distribution of the portion of the Closing Bonus allocated to the period prior to the parties' marriage does not end the inquiry. Aucoin-Thieme has also asserted claims based on equitable principles. As a remedy for alleged unjust enrichment, Aucoin-Thieme seeks a constructive trust and an allocation of a percentage of the Closing Bonus that was earned by Thieme while they cohabited prior to their marriage.

"The Family Part is a court of equity." Randazzo v. Randazzo, 184 N.J. 101, 113 (2005); see also Carr, supra, 120 N.J. at 351 (noting that "[t]he Legislature has recognized that courts' equitable powers are particularly appropriate in the context of domestic relations"); A.W. v. T.D., 433 N.J. Super. 365, 370-71 (Ch. Div. 2013). A "court [of equity] must exercise its inherent equitable jurisdiction and decide the case based upon equitable considerations." Kingsdorf ex rel. Kingsdorf v. Kingsdorf, 351 N.J. Super. 144, 157 (App. Div. 2002). As an Appellate Division panel observed,

23

> cases must ultimately be decided on facts. Our law is not to be applied in the abstract, but must be considered in light of the factual circumstances in an individual case. Depending on such facts, an adjustment of the rights of the parties may vary from one case to another. This is particularly true in a court of equity, where a family court may give full range to equitable doctrines in dealing with matrimonial controversies.
>
> [A.W., supra, 433 N.J. Super. at 370 (citations omitted).]

As this Court has noted, "[e]quities arise and stem from facts which call for relief from the strict legal effects of given situations." Carr, supra, 120 N.J. at 351 (quoting Untermann v. Untermann, 19 N.J. 507, 518 (1955)).

To prove a claim for unjust enrichment, a party must demonstrate that the opposing party "received a benefit and that retention of that benefit without payment would be unjust." Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 110 (2007) (quoting VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994)). "That quasi-contract doctrine also 'requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.'" Ibid. (quoting VGR Corp., supra, 135 N.J. at 554).

In the event that a court finds unjust enrichment, it may impose a constructive trust. That remedy has been described as

24

"the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." Carr, supra, 120 N.J. at 351 (quoting Beatty v. Guggenheim Expl. Co., 122 N.E. 378, 380 (N.Y. 1919)); see also Hill v. Warner, Berman & Spitz, P.A., 197 N.J. Super. 152, 168 (App. Div. 1984) (defining constructive trust). Equitable remedies such as constructive trusts "are not based on the actual intent of the parties, but 'are arbitrarily imposed by the court to prevent an unjust enrichment.'" Carr, supra, 120 N.J. at 352 (quoting Coney v. Coney, 207 N.J. Super. 63, 75 (Ch. Div. 1985)). As this Court has observed, "[g]enerally all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not limited to, fraud, mistake, undue influence, or breach of a confidential relationship, which has resulted in a transfer of property." D'Ippolito v. Castoro, 51 N.J. 584, 589 (1968).

In Carr, supra, the trial court considered the plaintiff wife's claims that she was entitled to equitable distribution or an elective share of assets owned by her husband, who died during their protracted divorce proceedings. 120 N.J. at 339-40. Citing the plain language of the equitable distribution statute, the Court noted that the statute afforded relief to a

party only upon the entry of "a judgment of divorce" and that its remedy was accordingly unavailable to the plaintiff. Id. at 341 (citing N.J.S.A. 2A:34-23). The Court held that an elective share under the probate code was similarly barred by virtue of the plaintiff's separation from her husband and the pendency of divorce proceedings prior to his death. Id. at 344-46. The Appellate Division and this Court affirmed the trial court's rejection of both statutory claims. Id. at 354.

Notwithstanding the failure of the plaintiff's statutory claims in Carr, the trial court imposed a constructive trust, awarding to the plaintiff a share of the marital assets controlled by the husband's estate. Id. at 350-51. The Appellate Division concurred with the trial court that a constructive trust was an appropriate remedy, and this Court affirmed that determination. Id. at 351-54.

The Court observed that judges can "[']presume that the parties []intended to deal fairly with [each other'] [and will] [']employ the doctrine of quantum meruit, or equitable remedies such as constructive or resulting trusts[] in order to [i]nsure that one party has not been unjustly enriched, and the other unjustly impoverished, on account of their dealings.'" Id. at 352 (fourth alteration in original) (quoting Kozlowski, supra, 80 N.J. at 390-91) (Pashman, J., concurring). It concluded that equitable relief in the setting of Carr was consistent with the

26

protective policies advanced by the Legislature in the equitable distribution and probate laws. Id. at 352-54. The Court agreed with the trial court that in the setting of that case, the estate's retention of "the share beneficially belonging to Mrs. Carr" could give rise to unjust enrichment. Id. at 353-54. It held that "if warranted by the evidence, the equitable remedy of constructive trust should be invoked and imposed on the marital property under the control of the executor of [the deceased husband's] estate." Id. at 353.

The principles expressed in Carr apply with equal force to this appeal, and warrant the imposition of a constructive trust governing a portion of Thieme's Closing Bonus in the unusual circumstances of this case. As the evidence presented at trial made clear, the prospect that Thieme would be generously compensated was a significant factor in the parties' personal and financial planning from the early stages of their relationship. Thieme and Aucoin-Thieme each relied on the expectation of deferred compensation if IBG were sold as they made important decisions for themselves and their family.

The parties' shared anticipation that Thieme would be paid deferred compensation was more than wishful thinking. Given IBG's written commitment to Thieme, and its owners' genuine desire to reward their valued employee, both parties had reason to anticipate a significant payment in the event of a sale.

27

Whether the Statement of Understanding constituted a legally binding contract or an unenforceable expression of IBG's plan, it conveyed an important message. IBG's owners acknowledged their intention to compensate their key employee and longtime friend in a manner commensurate with his pivotal role in the success of their business. That confirmation occurred early in the relationship between the parties. Although the parties dispute the timing and content of their discussions about the Statement of Understanding, it is clear that on multiple occasions Thieme advised Aucoin-Thieme about his expectation that any sale of IBG could generate a substantial financial reward for their family.

Although the prospects for IBG's sale were for many years uncertain, and the company's owners were not in a position to quantify Thieme's compensation until the September 2012 sale, IBG's commitment to reward him was an important consideration in the decisions made by the parties throughout their cohabitation and marriage. Despite his grueling schedule and its impact on his family, Thieme was determined to retain his job. Although he understood Aucoin-Thieme's desire to work outside of the home, Thieme firmly opposed any suggestion that he pursue less demanding employment and take on a more active role in their daughter's care so that she could seek work outside the home. He reasoned that his work at IBG was crucial to the family's

28

future. In short, as they planned their finances and personal lives, Thieme and Aucoin-Thieme anticipated that they might someday share in the proceeds of the company's sale.

During the parties' eight years of cohabitation, and for most of their brief marriage, Aucoin-Thieme undertook significant efforts to support Thieme's challenging career. As Thieme acknowledged, Aucoin-Thieme ably shouldered almost all of the responsibility for caring for their daughter. She maintained and repaired their homes, managed their rental properties, and paid the bills. With the exception of a brief per diem job substitute teaching at her child's preschool, Aucoin-Thieme did not pursue a career or return to school. She moved with Thieme and their daughter to Virginia to accommodate IBG's need to assign Thieme to an important contract. There is no doubt that Aucoin-Thieme was at times disruptive and abusive when Thieme was working, and the series of inflammatory e-mails that she sent to his employer and co-workers in October 2011 could have derailed his career. Thieme was not without fault either, as he admitted.[6] Despite their disputes, for most of their time together, Aucoin-Thieme's efforts enabled Thieme to

---

[6] We do not find the conduct of either party to be sufficiently egregious to constitute an appropriate factor on the allocation of the Closing Bonus on remand.

focus almost exclusively on IBG, and thus supported his professional development.

Indeed, Thieme himself recognized that Aucoin-Thieme's contributions to their family should be rewarded. He acknowledged Aucoin-Thieme's "great sacrifice" of her "career and educational aspirations" to care for their daughter. He committed to support her "fully." Thieme expressly recognized that his obligation to financially support Aucoin-Thieme implicated, to some extent, any compensation that he would receive in the event that IBG were sold. He assured Aucoin-Thieme that if he received an unexpected bonus, they would split that bonus, after the deduction of taxes. Thieme represented that he viewed Aucoin-Thieme's claim to share in his assets to date back to 2003, when their child was born.

Accordingly, the record supports the conclusion that Aucoin-Thieme's decision not to seek further education and employment was made, at least in part, in reliance on Thieme's financial commitment to her. Aucoin-Thieme clearly made decisions regarding her future in light of IBG's unequivocal expression of its intent to fairly compensate Thieme if it had the opportunity to do so, and Thieme's repeated representations that he would generously support her in return for her efforts on the family's behalf. Even as the parties negotiated the terms of their divorce, Thieme suggested to Aucoin-Thieme that

30

if IBG were sold and he were afforded a portion of the proceeds, that payment would be shared with her.

Thieme's Closing Bonus, however, materialized three months after the parties' divorce was finalized -- too late to be divided, along with other assets, in the PSA.[7]  By virtue of the trial court's proper application of N.J.S.A. 2A:34-23(h) to the Closing Bonus, Aucoin-Thieme was awarded less than two percent of the Bonus by equitable distribution.  As the husband's death in Carr deprived the wife of relief under the equitable distribution and probate statutes, by virtue of the timing of the critical events in this case, only a limited statutory remedy was available to Aucoin-Thieme.  We conclude that a decision constraining Aucoin-Thieme to the nominal share of the Closing Bonus that is authorized by the equitable distribution statute would result in unjust enrichment, and that Aucoin-Thieme has proven the elements of that equitable claim.

As a remedy, a percentage of the portion of the Closing Bonus that Thieme earned during the period in which the parties cohabited prior to their marriage should be deemed to be held by

---

[7]  Like the trial court, we do not find that Thieme defrauded Aucoin-Thieme with respect to the Closing Bonus; no evidence rebuts his assertion that IBG's owners did not inform him of IBG's sale until it was concluded, and the testimony of Raj Nanavati supports Thieme's contention.

Thieme in constructive trust for Aucoin-Thieme.[8]  We make no determination as to the precise time period for which the Closing Bonus should be shared by the parties, the percentage of the Closing Bonus that should be allocated to Aucoin-Thieme to avoid unjust enrichment, or the impact of taxes imposed on Thieme by virtue of the Closing Bonus.

On remand, the court should make those determinations based on the comprehensive record presented at trial.[9]  That record includes evidence of the contributions made by each party to their home and family, Aucoin-Thieme's impact on Thieme's employment at IBG, and the parties' financial status at the time of trial.  The court may, in its discretion, permit the parties to supplement the record as appropriate.

V.

The judgment of the Appellate Division is affirmed in part and reversed in part, and the matter is remanded to the Family Part for proceedings consistent with this opinion.

---

[8]  We do not reach Aucoin-Thieme's claims for quantum meruit, breach of implied contract, breach of joint venture or breach of partnership.

[9]  Although the equitable distribution statute does not govern the allocation of the Closing Bonus, some of the factors identified in N.J.S.A. 2A:34-23.1(a) to -(p) may be relevant to the trial court's allocation of a portion of the Closing Bonus on remand.  See N.J.S.A. 2A:34-23.1(a) to -(p).

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE PATTERSON's opinion.