# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1465-23
           A-2065-23

K.D.C.,

      Plaintiff-Respondent,

v.

P.R.C.,

      Defendant-Appellant.

_____

P.R.C.,

      Plaintiff-Respondent,

v.

K.D.C.,

      Defendant-Appellant.

_____

Submitted March 13, 2025 — Decided March 24, 2025

Before Judges Walcott-Henderson, and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket Nos. FV-20-0793-24 and FV-20-0816-24.

Eric M. Mark, attorney for appellant in A-1465-23 and respondent in A-2065-23.

K.D.C., respondent pro se in A-1465-23 and appellant pro se in A-2065-23.

PER CURIAM

In these back-to-back appeals, plaintiff P.C. and defendant K.C. appeal from the entry of cross-final restraining orders (FROs) entered on December 6, 2023, under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.[1] The court granted each party an FRO. Both parties argue the court erred by entering the FROs against them. We affirm.

I.

P.C. and K.C. were married in 2017 and lived together until October 29, 2023, when K.C. called police to report P.C. had committed an act of domestic violence against her. When police arrived at the home, K.C. reported P.C. had grabbed and shaken her, causing her arms to strike a door and resulting in pain. Police took P.C. into custody and K.C. was granted a temporary restraining order

---

[1] We use initials to protect the confidentiality of the victim in these proceedings. R. 1:38-3(d)(10).

(TRO) against P.C. based on the predicate act of assault, N.J.S.A. 2C:12-1. A few days after this incident, on November 1, 2023, P.C. obtained a cross-TRO against K.C. based on the predicate acts of harassment, N.J.S.A. 2C:33-4, and criminal mischief, N.J.S.A. 2C:17-3.

At the FRO hearing, K.C. testified that she and P.C. began arguing after she asked him to attend couple's therapy. He refused and instead told K.C. that he wanted a divorce. "[P.C.] followed [her] around the house and attacked [her] . . . in several different areas." She stated that "[w]hen [she] was in the basement, he came to the basement to tell [her] not to wash the clothes and threw them out. [She] left the basement and went into the bedroom." He pushed her, causing her to stumble forward, injuring her back and "eventually tossed [her] through the double doors—in the bedroom into the living room[,]" causing her arms to hit the doors as she was falling. As a result of this incident, K.C. testified she suffered "a contusion" on her arms, and pain in her "arms, shoulders, [and] back."

When K.C. told P.C. to get away from her, he started recording her on his phone. Once K.C. noticed P.C. was recording her, she realized "that this was intentional, consistent and probably wouldn't stop[,]" and that was when she "[c]alled the police."

K.C. was granted her TRO in the early morning hours of October 30.  She later had to amend the TRO complaint to include prior acts of domestic violence, including that P.C. had sexually assaulted her on October 27, 2023.[2]

At trial, K.C. testified about this incident as follows:

> I was asleep.  When I awakened, it was because [P.C.] touched me on the side of my body; I turned over.  He grabbed me by my neck from behind, turned me back over.  I tried to clinch my legs closed; I said no; and he pried my legs open and penetrated [me].

K.C. sustained injuries to her arms and groin area.  She did not report the sexual assault to the responding officers at the scene but told an officer later that day and was sent to the hospital for a rape kit.

K.C. also testified about four additional sexual assaults P.C. committed against her in 2023.  On April 4, "[P.C.] ripped [her] underwear and tattered them and tore them off, ripped them off and penetrated [her] against [her] will."  On October 19, she was "awakened from [P.C.] attempting to have sex with [her] against [her] will," and when she objected, he "kick[ed her] in [her] legs."  She said, "I believe October 19[] is when he kicked me to the floor."  And, on October 22, P.C. grabbed her and attempted to have sex with her.  On October

---

[2]  The amended TRO is not a part of the appellate record.

23, P.C. again attempted to have sex with K.C. against her will.  She testified, "I was sleeping, he touched me—trying to motion me to have sex.  I refused it."

K.C. also testified regarding a 2016 incident, stating,

> [P.C.] came home and started screaming at me because dinner wasn't ready, or he said dinner wasn't ready on time.  I was completely flabbergasted; I didn't understand why I was getting yelled at.  I explained to him that I ran a[n] errand for my grandmother and that was the reason that I was running behind with dinner. He screamed at me, he cursed [at] me, and he [strangled] me.

K.C. reported having scars on her neck, which were "welted and bloody and burned to the touch."

On cross-examination, P.C. questioned K.C.'s recollection, asking whether it is "possible that [K.C. does not] remember so many details that happened recently because [she was] making them up?"  K.C. responded, "[n]o." She also reported feeling "[a]fraid, sad, [and] scared" as a result of P.C.'s actions.  The court asked K.C. whether she was sexually assaulted on October 29, and she responded, "[n]o."

P.C. played a video from the officer's body-worn camera to illustrate K.C. had failed to mention the alleged sexual assault to the responding officers on October 29.  He next introduced a video from his cell phone depicting K.C. standing in her living room with a coffee table on the floor, which she claimed

5

P.C. threw her into. In the video, P.C. twice asks K.C. to leave him alone because he is trying to get dressed. The video shows P.C. standing in a doorway asking K.C. to go away while she continues to approach him. K.C. explained that part of the video shows her returning to an area she was in before P.C. had thrown her. And, the part of the video depicting her falling on her own accord in another area of the home was not the cause of her arm injury; instead, she maintained P.C. had pushed her.

P.C. denied all of K.C.'s allegations of sexual abuse and testified that on the morning of October 29, he woke up alone between 9:30 a.m. and 10:00 a.m. After having a cigarette on the porch, he was eating breakfast when K.C. entered the room and "started talkin' down at [him], started screamin' at [him] all over the kitchen." She also entered the bedroom and "started talkin' down to [him]." The court asked P.C. what talking down to him meant, and he replied "[s]he's screaming and pointing fingers and tellin' me . . . that I'm evil; that the [d]evil is . . . coming to get me; that . . . all I want to do is get a divorce."

P.C. testified that on October 29 K.C. would not leave him alone. She was trying to slide underneath the door and fell. Then his phone, which he had been using to record her, fell. He testified

> she fell on my phone and then I picked the phone up,
> readjusted and then she came back and . . . pushed the

6

phone, [causing me to] drop[] the phone again. That's when I picked up my phone and put it on top of the bed to give a full view of the whole room to the door.

At that point, K.C. left the bedroom.

The court asked P.C. "[w]hat exactly . . . are you contending is the harassment there?" P.C. replied that he was referring to K.C.'s use of offensively coarse language.

On cross-examination, P.C. testified he started recording K.C. because he felt she was going to do something to hurt him. He denied pushing K.C. into the table and stated the damage to his phone was because she hit it. It was not unusual for K.C. to say demeaning things to him. He did not deny there was an argument in 2016, but the argument ensued after he had returned home from "a hard day of work" with dinner for them both, which resulted in K.C. throwing the food at him and "harassing" him by saying "[he's] disrespectful" and "not a man."

The court concluded P.C. had committed the predicate act of simple assault against K.C. It found

there was a physical altercation between the parties. As a result of that, she did suffer some injuries, pain at the very least. She said that he pushed her out of the bathroom at one point in time, pushed her in the back and pushed her another time, her arms hit some doors

7

and she was injured. She had pain in her arms, her shoulders[,] and her back.

The court found K.C. had committed an act of criminal mischief against P.C. It based its finding on P.C.'s testimony that during the October 29 incident, K.C. had "struck his phone with some clothes that she had . . . [and] the phone was knocked off the chair onto the floor and . . . cracked."

The court next addressed whether there is a need for a restraining order, under the second prong of Silver v. Silver. 387 N.J. Super. 112, 127 (App. Div. 2006). It found "[i]t is painfully clear to this [c]ourt that the parties . . . have been involved . . . —in a very toxic relationship," and "[the court] do[es] believe both parties need to be protected from any future acts of domestic violence and abuse[,] which could be committed even if they're not living together." The court granted each party an FRO because to protect from each other.

## II.

Our review of a court's grant of an FRO is limited. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)).

Deference is particularly warranted where, as here, "the evidence is largely testimonial and involves questions of credibility." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). This is because it is the trial judge who "sees and observes the witnesses," thereby possessing "a better perspective than a reviewing court in evaluating the veracity of witnesses." Pascale v. Pascale, 113 N.J. 20, 33 (1988) (quoting Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)). Therefore, a reviewing court will not disturb a judge's factual findings unless convinced "they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort v. Invs. Ins. Co., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)).

Consequently, "findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015) (citing Cesare, 154 N.J. at 411-12). A reviewing court does not, however, accord such deference to the court's legal conclusions, which are reviewed de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The entry of an FRO under the PDVA requires the trial court to make certain findings pursuant to the two-step analysis in Silver, 387 N.J. Super. at

9

125-27. Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in [N.J.S.A. 2C:25-19(a)] has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)).

If a predicate offense is proven, the judge must then assess "whether a restraining order is necessary, upon an evaluation of the facts set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." J.D. v. M.D.F., 207 N.J. 458, 475-76 (2011) (quoting Silver, 387 N.J. Super. at 127). Whether a restraining order should be issued depends on the seriousness of the predicate offense, on "the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment[,] and physical abuse[,] and [on] whether immediate danger to the person or property is present." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995) (citing N.J.S.A. 2C:25 -29(a)).

## III.

On appeal, P.C. challenges the court's finding of the predicate act of simple assault as the basis for the FRO entered against him. He posits the court mistakenly found he assaulted K.C. because K.C.'s testimony was not reliable and there is no other evidence that he pushed her, causing injury. P.C. further

contends "[K.C.'s] testimony was unemotional, she did not cry or shake, and she took her time to fabricate her testimony according to what she thought was best at the moment."

A person commits the disorderly persons offense of simple assault if by "[a]ttempt[ing] to cause or purposely, knowingly or recklessly causes bodily injury to another." N.J.S.A. 2C:12-1(a)(1).

> Bodily injury is defined as "physical pain, illness or any impairment of physical condition." N.J.S.A. 2C:11-1(a). Not much is required to show bodily injury. For example, the stinging sensation caused by a slap is adequate to support an assault. State v. Downey, 242 N.J. Super. 367, 371 (Law Div. 1988); see also New Jersey v. Bazin, 912 F.Supp. 106, 115 (D.N.J. 1995) ("Even the slightest physical contact, if done intentionally, is considered a simple assault under New Jersey law.").
>
> [N.B. v. T.B., 297 N.J. Super. 35, 43 (App. Div. 1997).]

Here, the court found K.C.'s account of the October 29 physical altercation to be credible. The court specifically found K.C.'s testimony that P.C. had "pushed her out of the bathroom at one point in time, pushed her in the back and pushed her another time, her arms hit some doors and she was injured[,]" credible and concluded that "[a]s a result of that, she did suffer some injuries, pain at the very least." Based on its finding P.C.'s actions had caused K.C. pain,

11

the court concluded K.C. had carried her burden of proving by a preponderance of credible evidence P.C. had assaulted her.

Applying our deferential standard of review, we discern no error in the court's findings of fact and conclusion P.C. committed an act of simple assault; a predicate act under the PDVA. The court's findings were predicated on the substantial credible evidence in the record and credibility findings, which we have no basis to second guess. K.C.'s account of the October 29 incident met the elements of N.J.S.A. 2C:12-1(a)(1) because P.C.'s conduct purposely injured K.C. by causing her pain.

We next address K.C.'s argument the court erred in finding the predicate act of criminal mischief. Under N.J.S.A. 2C:17-3(a)(1), an individual is guilty of criminal mischief if they "[p]urposely or knowingly damages tangible property of another."

The court found credible P.C.'s testimony that, during the October 29 physical altercation, "his phone [was] positioned on a chair and that [K.C.] . . . actually struck his phone with some clothes that she had, that [it] was knocked off the chair onto the floor and . . . cracked." We discern no error in the court's finding K.C. purposefully damaged P.C.'s cell phone, because the record shows

A-1465-23

she knew P.C. was using it to record their argument and she purposely used the clothes she was folding to destroy the phone.

Lastly, having found each party committed a predicate act of domestic violence, the court also correctly concluded FROs were necessary to protect the parties from each other. Pursuant to Silver, in all cases, "the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in [N.J.S.A. 2C:25-29(a)(1)] to . . . (6), to protect the victim from an immediate danger or to prevent further abuse." 387 N.J. Super. at 126.

We reject P.C.'s assertion the court erred in finding K.C. needed an FRO because there is a pending divorce. The court expressly rejected this argument and found that the parties' separation would be insufficient to protect them because based on their history and acrimonious relationship they were capable of future acts of domestic violence regardless of the distance between them.

We are satisfied the court's finding was based on the substantial credible evidence in the record, including the parties' testimony concerning the October 29 incident and their prior history of domestic violence extending from at least 2016. The court aptly described the parties' relationship as "toxic," and it is of no consequence the parties had filed for divorce and were no longer living together. The court concluded an FRO was necessary to protect these parties

13

from one another based on the totality of the circumstances.  "When the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO 'is most often perfunctory and self-evident.'"  A.M.C. v. P.B., 447 N.J. Super. 402, 418 (App. Div. 2016).

To the extent we have not addressed any remaining arguments, we are satisfied they are without sufficient merit to warrant further discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed in A-1465-23 and A-2065-23.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division