# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0319-19T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

S.S.,

      Defendant,

and

R.B.,

      Defendant-Appellant.

_____

IN THE MATTER OF B.B.,
a minor.

_____

      Submitted November 18, 2020 - Decided February 4, 2021

      Before Judges Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0263-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Carol L. Widemon, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Salima E. Burke, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David Valentin, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant R.B. (Rick)[1] appeals from Family Part orders continuing the suspension of his visitation with his son, B.B. (Bill), and terminating the litigation.[2] Rick contends the court erred by relying on an inadmissible net opinion that visitation will cause emotional harm to Bill. Rick also contends the court erred by relying on its in camera interview with Bill because the interview

_____

[1] We employ initials and pseudonyms because court records relating to Division of Child Protection and Permanency proceedings are excluded from public access. R. 1:38-3(d)(12).

[2] Bill's mother, S.S., is not involved in this appeal.

2

was not conducted in accordance with N.J.S.A. 2A:84A-32.4 and violated his due process rights. We agree with the Division of Child Protection and Permanency (Division) and Bill's Law Guardian that Rick's contentions are devoid of merit. We affirm.

I.

Bill was born to Rick and S.S. in February 2004 and lived with his parents until they separated two years later. Following their separation, Rick was awarded physical custody of Bill, and S.S. enjoyed parenting time.

The Division first became involved with Bill in October 2016, when he "arrived [at] school with a mark over his left eye and [on] his shoulder." He reported "the mark on his eye was caused by a pinky ring that [Rick] wears, [from] when he punched him," and that he was "also . . . punched on his arm." The Division began "working with [Rick]" and "referred him [for] parenting skills" beginning in February 2017.

Bill later reported that in January or February 2017, Rick "brought [him] to the woods because [Rick] thought [Bill] was ruining his life." Bill stated Rick "thought [Bill] and [his] mom w[ere] hacking into the computer and had cameras in the house." Bill explained that "when they got to the woods[, Rick] showed him a rubber hose he brought . . . to hit him with . . . so [the Division] could not

see."  Bill stated that Rick did not hit him, but instead "sat down with him and said . . . [Bill] was ruining everybody's life."  Bill said he was forced to agree with Rick's false claims about the cameras and computer hacking because Rick "would not stop."

Rick brought Bill "to the wood[s]" again in April 2017 and accused him of "put[ting] cameras in the house."  Bill said "he was forced to say that there was a camera in his [PlayStation 4 (PS4)]."  Bill reported that Rick "threatened to leave him in the woods," approximately three miles from home, at sundown. Rick "smashed" the PS4 the next day "because he thought the camera in the PS4 was looking at him."  In April 2017, the service providing Rick with parenting skills training informed the Division "there had not been a marked improvement [in Rick] despite the fact that he had completed seven out of twelve sessions."

On June 18, 2017, "around midnight," Rick "accused . . . [Bill] of putting up cameras around the house to spy on hi[m] . . . and . . . reporting back to his mother."  Rick "drove [Bill] to . . . a back road . . . surrounded by woods, . . . kicked [Bill] out of the car[,] and told him to find his own way home."  Bill was discovered by "some men" who contacted the police.  The police released Bill into S.S.'s custody.

A-0319-19T2

Bill reported that the next day – Fathers Day – Rick "kept calling and calling" S.S. until Bill "got on the phone to wish him a Happy Father's Day." Rick yelled at Bill, and when a Division caseworker who was present spoke with Rick, he "scream[ed] at her." Rick said he was going to S.S.'s home, and the caseworker called the police. When Rick arrived, the caseworker asked Rick to "sign a Safety Protection Plan," but Rick refused. The Division then conducted a Dodd removal of Bill.[3]

The Division filed a complaint and order to show cause for temporary custody, care, and supervision of Bill. The court granted the Division care and supervision of Bill; awarded S.S. physical custody; permitted Rick and S.S. to retain joint legal custody; and ordered that Rick was allowed visitation. The court deferred determining whether visitation would be therapeutic or supervised until the Law Guardian spoke to Bill. The court later held a hearing on the return of the order to show cause, and, at that time, with the consent of Rick's counsel, suspended visitation between Rick and Bill and ordered a psychological evaluation of Bill.

---

[3] A "Dodd removal" is an emergency removal of a child from the custody of a parent without a court order, as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

During an August 2017 psychological evaluation with Dr. Barry A. Katz, Ph.D., Bill described the instances when Rick had taken him to the woods, and he described physical abuse, stating that Rick hit him and punched him "in [the] gut," "try[ing] to [k]nock the air out of" him. Bill also said that on two occasions Rick "kick[ed him] in the back of [his] knees so [he] would fall over."

Dr. Katz reported that Bill "admitted . . . being fearful of" Rick "get[ting] angry . . . and 'drill[ing]' him" or "hitting him." Bill said Rick is "not nice to him and does not treat him well," described Rick as "abusive," and stated Rick "punish[ed him] for telling the truth." Bill also told Dr. Katz that "aside from confronting him for lying and punishing him[,] . . . [Rick] did not interact with him much."

Based on testing he performed, Dr. Katz found Bill had "consistent feelings of fear toward [Rick], especially with regard to [Rick] taking him to the woods and otherwise punishing him for telling the truth." Dr. Katz concluded that the "data indicated that [Bill was] struggling with a history of physical and emotional abuse/victimization by his father[, Rick]." Dr. Katz "recommended that any contact between [the parties] be supervised until [Rick] . . . completed a forensic psychological and parenting assessment and it has been recommended otherwise," and "that [Bill] not have contact with [Rick] if [he] is still expressing

such fears about [Rick] and/or if [Rick] . . . shows impaired reasoning or parenting."

In October 2017, a Division caseworker "asked [Bill] how he felt about reaching out to his father with a telephone call to say hello." Bill "repeatedly" "stated he did not want to" speak with Rick, but he "unwillingly" agreed. During the call, Rick expressed displeasure with Bill because "[i]t ha[d] been months" since Bill called, and Bill "did not even say hello" although Bill did. Rick said Bill was "being disrespectful" when he asked Rick about his personal items that were in Rick's possession, and Rick otherwise was silent after Bill made certain statements and asked some questions. After Bill again asked Rick about his personal items, the "phone disconnected." Bill "stated he did not want . . . to call his dad again."

Bill met with a clinician at the Middlesex Visitation Program (MVP) in November 2017, and he discussed his "past relationship with [Rick]," the June 2017 incident, and "recent phone contacts between h[im] and [Rick], which were terminated early due to [Rick]'s hostile tone." Bill "described his feelings of hopelessness about repairing his relationship with [Rick]," and stated "he d[id] not [currently] wish to have any contact or visits with [Rick]."

A-0319-19T2

Based on a Division referral, Bill participated in therapy at Jewish Family Services of Middlesex (JFS) from February to October 2018. In a March 2018 report, JFS noted Bill "expressed that he d[id] not want anything to do with [Rick], as he d[id] not want to get yelled at and blamed for his problems and lack of contact." Bill also reported Rick "[wa]s very mean, and that [Bill was] fearful of him. [Bill] stated that he d[id] not trust [Rick] and that even if [Rick] did change[,] . . . he would eventually go back to his old ways."

Dr. Katz conducted a psychological evaluation of Rick in March 2018. During the evaluation, Rick stated Bill was "turning into a loser" and a "failure," and that Bill was "manipulative." Rick denied Bill was afraid of being abused and said, "[T]he only thing [Bill] was scared of . . . was being grounded." Rick "reported avoiding direct physical violence toward [Bill]," but Dr. Katz found Rick "instead would engage in a pattern of explosive anger, threats of violence[,] and emotionally abusive behavior toward [Bill]." Dr. Katz noted Rick stated that when he believed Bill was lying, he "would respond in ways to punish [Bill], including acting out violently toward [him]." However, Rick also "denied problems with anger." Rick told Dr. Katz that Bill planted cameras in the home to spy on him, stating Bill "admitted" he had acted out "deliberately to have [Rick] hit him so that his mother could record it through the [PS4]." Rick also

"said he [was] agreeable to go to supervised or therapeutic visitation" and that "he would be willing to attend therapy."

Dr. Katz found Rick to "have a relative weakness in parenting," and to have "risk factors associated with child abuse relating to problems in the relationship and perception of his child along with problems with interpersonal relationships in general." Dr. Katz also found Rick "show[ed] no remorse or regret regarding his history of violence toward numerous individuals," and that Rick "appeared enthused and jovial as he recalled acting out violently." Dr. Katz observed that Rick "d[id] not see his violence and anger as a problem, but as an asset." Dr. Katz opined that Rick "d[id] not view himself as having any significant problems that need[ed] intervention or change," and that he "present[ed] as a poor candidate for treatment."

Dr. Katz concluded Rick "is not likely to change his pattern of abusive behavior toward [Bill]." He also found Rick "present[ed] with [a] very high risk of continued physical abuse, neglect[,] and emotional abuse towards [Bill]," that "[i]t [wa]s highly likely . . . [Rick] w[ould] continue to act out his anger toward [Bill] in inappropriate and harmful ways," and that the "risk of violence is increased by [Rick's] tendency to misinterpret and misperceive the motivations and actions of others." Based on those findings, Dr. Katz "recommended that

A-0319-19T2

[Rick] engage in extended therapy for violence, anger, coercive control[,] and antisocial behavior," and "that there be no contact between [Rick] and [Bill] until [Rick] has been reported to have benefited from treatment and then has been reassessed with regard to his ability to safely interact with [Bill]."

At an April 2, 2018 fact-finding hearing, Rick pleaded "no contest" to the Division's substantiation of his abuse or neglect by leaving Bill in the woods in June 2017. The court determined Rick's actions caused Bill's "physical, mental, or emotional condition to be impaired or in imminent danger of becoming impaired." The court's order terminated the Title Nine proceeding and directed that the matter thereafter "continue under Title [Thirty] as services [we]re necessary for the health, welfare, safety[,] and in the best interest of" Bill.

In its May 2018 report, JFS stated that Bill continued to express that he did not want any contact with Rick. Bill reported that "he did not want to get yelled at and/or called a liar" by Rick, and that he "felt fearful" of Rick when he had a recent chance encounter with him "at a Gamestop store." Bill explained that he reported the encounter to his mother, who called the police because "he [was] not supposed to have unsupervised contact" with Rick. JFS also reported that "[w]hen asked if he would consider having supervised phone contact with [Rick], [Bill] again stated that he did not want to at th[at] time, as he would

10

probably be yelled at again." In its June 2018 status update, JFS reported that Bill "agreed to try to contact [Rick] at his next therapy session, despite being reluctant to do so."

In June 2018, Rick underwent the first of two psychological evaluations with Dr. James Reynolds. Dr. Reynolds concluded Rick "d[id] not appear to appreciate the wrongfulness or harmfulness of his actions toward [Bill]," and Rick "justified and minimized the use of corporal punishment." He also found Rick "may have developed an avoidant manner of interacting with others, and may have below average psychological resources for coping with the demands of everyday living." He opined "[t]hese characteristics may be obstacles to [Rick] making progress in services unless a strong therapeutic alliance is developed around agreement on the goals, roles, and tasks of services that are consistent with [his] own values and beliefs."

Dr. Reynolds nonetheless found Rick "appear[ed] to be highly motivated to have contact with [Bill], and [Rick] expressed a willingness to participate in recommended services in order to have contact." Dr. Reynolds noted "counseling services that include the possibility of future contact that ensure [Bill's] sense of safety and own autonomy appear[ed] clinically appropriate." He also opined that Bill "[wa]s at an age[, fourteen,] where attempting to compel

such contact would be counter-productive," and that "any such services provided to [Bill] should incorporate his wishes for future contact with his father, if any, rather than attempt to coerce him in any manner."

In its July 2018 report, JFS stated that Bill "agreed to call his father on several occasions," but that Rick "did not answer when called."[4] JFS further noted that Bill "ha[d] become increasingly angry and tearful on one occasion during therapy sessions, as he d[id] not want to think about [Rick]." Bill "indicated that he would not voluntarily contact [Rick], and would prefer not ever to see him again, as [Rick] ha[d] stated on many occasions that he d[id] not care about him." JFS concluded that "[a]s a result of [Bill]'s emotional reactions and ambivalence, it . . . appear[ed] that it [wa]s currently not a good time for [him] to be forced to have phone contact with [Rick]." After its final meeting with Bill in October 2018, JFS reported Bill "made some progress in how he [wa]s functioning and his coping with his everyday life," but that he "ha[d] continued to decline any contact with [Rick] by phone or in person."

---

[4] Defense counsel objected to the admission of the JFS reports due to purported procedural issues, and because Rick denied he was contacted at the times JFS indicated and that he was advised of the calls in advance. Rick does not challenge on appeal the court's decision to admit the JFS reports. We therefore do not address the propriety of the court's ruling. See Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008) (noting that an issue not briefed on appeal is deemed waived).

Rick began individual counseling sessions with Dr. Kevin Enright in December 2018. In his first report, Dr. Enright found Rick "present[ed] much like the man described in Dr. Reynolds'[s] report. [Rick] d[id] seem like he c[ould] become flustered and act out aggressively or pessimistically." He also noted that Rick "seem[ed] like he would benefit from a therapist who could point him in the direction of success," and that they "appear[ed] to be in the initial stages of helping [Rick] to reframe his current circumstances as related to his own victimization histories, [and] showing him how to navigate successfully as a parent." Dr. Enright concluded that Rick was "in continued need of [i]ndividual [c]ounseling to address his difficulties applying mental health providers' tools, techniques, and concepts to achieve his family goal of gaining greater access to [Bill]," but that "[i]t [wa]s encouraging that [Rick] seem[ed] more motivated to address these issues and ha[d] begun to express himself in ways that [we]re . . . aligned with his stated therapy goal."

Dr. Reynolds performed his second evaluation of Rick in February 2019, and he noted that Rick "appear[ed] to be benefiting from the therapy afforded to him by Dr. . . . Enright" and that Rick's "statements suggest[ed] that he [wa]s developing a positive therapeutic relationship with Dr. Enright, which [wa]s an indicator that treatment may eventually be successful." He opined that "[t]he

reports from Dr. Enright describe[d Rick] as becoming less defensive and more receptive to therapeutic interventions"; they evidenced Rick "being receptive to becoming more self-protective, being assertive rather than aggressive, and becoming more proactive as he focuse[d] on treatment goals"; and they "indicate[d] that [Rick wa]s making slow but steady progress."

Dr. Reynolds also stated that Rick "continue[d] to hope that he and [Bill] w[ould] be able to have supervised visits in the future so that they may potentially repair the ruptures in their relationship," but that Dr. Reynolds believed, and Rick "recognize[d], . . . that [Bill wa]s at an age where attempting to compel such contact would be counter-productive." He concluded Rick "[wa]s not likely to present a risk of harm to [Bill] if they ha[d] supervised visits at th[at] time or in the future."

Dr. Enright authored his second report in April 2019, and he noted Rick still "seem[ed] like he c[ould] become flustered and act out aggressively or pessimistically" and that "[i]t may take [Rick] more time to internalize the systemic conceptualization of the problems he faced," but that "he present[ed] as someone who would likely benefit from rehearsal of those concepts/techniques." He concluded Rick "[was still] in . . . need of [i]ndividual [c]ounseling to address his difficulties applying mental health providers' tools,

14

techniques, and concepts to achieve his . . . goal" of resuming contact with Bill, but that "[i]t [wa]s encouraging that [he] seem[ed] to still be motivated to address th[o]se issues."

In April 2019, the court commenced a hearing on the issue of the suspension of Rick's visitation with Bill. At the outset of the hearing, the court noted the initial suspension of Rick's visitation in 2017 was with his consent, that the court subsequently ordered services to promote the reinstatement of visitation, and that Rick no longer consented to the suspension of visitation. The court noted that the hearing was for the purpose of determining whether there was clear and convincing evidence supporting the continued suspension of Rick's visitation with Bill.

Dr. Katz testified concerning his evaluations of Rick and Bill, his reports from the evaluations, and his updated opinion on visitation following his review of post-evaluation documentation, including the Division's contact sheets, the JFS and MVP reports, and Drs. Reynolds's and Enright's reports. Dr. Katz concluded that "from the 2017 [Division] report[]," which detailed the telephone communication between Rick and Bill, "that . . . [Rick] would use such opportunities to act out towards [Bill] . . . rather than be supportive." Dr. Katz opined that "when it comes time for [Bill] to talk[,] . . . [he] expresses being

15

scared, vulnerable, et cetera, then this becomes another source of trauma that [Rick] acts out upon [Bill], that again re-triggers the prior traumas."

Dr. Katz also relied on a November 16, 2017 MVP report which stated "there were phone contacts terminated early due to [Rick's] hostile tone," and that Bill "described his feelings of hopelessness about repairing his relationship with [Rick]." Dr. Katz opined that the report "connects to [Bill's] earlier childhood . . . traumas that he's experience[d,] . . . specifically, his feelings of hopelessness about repairing his relationship with [Rick]." Dr. Katz explained that he "see[s] those issues in terms of hopeless[ness], of a . . . trauma, of fear . . . consistent in the child's report . . . from the treatment reports, from the [Division] record, and from [his] interview with [Bill]." Dr. Katz confirmed the reports and records that informed his opinion were "the type[s] of record[s] that[] [are] reasonably relied [up]on by experts in [his] field in forming . . . opinions . . . [regarding] visitation."

Dr. Katz also discussed the March and May 2018 reports from JFS which explained that Bill expressed his fear of Rick, stated Bill "does not want anything to do with [Rick]," and included information concerning Rick and Bill's encounter at the Gamestop store. Dr. Katz testified the reports "show again continued problems . . . with the treatment," and he found "the issues

16

reported were issues consistent with the other reports that [he] had mentioned . . . with the . . . pattern of behavior that was noted on . . . the psychological testing of [Rick], . . . [and with his] prior hypothesis and conclusions about [Rick]."

Dr. Katz further discussed the reports detailing interactions between Rick and Bill, explaining they showed Rick's "continued coercive control . . . [and] passive aggressive means of acting out towards [Bill] even under the most stringent supervised circumstances, therapeutic phone contact." He opined that Rick "repeatedly was non-compliant in a specific way to act out towards [Bill] and [Bill] not only understood it, but experienced it emotionally from the reports and reactions of the child," and that "[t]here . . . [were] ongoing indications of [Bill]'s struggle emotionally with these issues . . . which again is consistent with the hypothesis of . . . ongoing complex trauma."

Dr. Katz also testified concerning Dr. Reynolds's evaluations of Rick. Dr. Katz "disagree[d] with a number of areas . . . Dr. [Reynolds] . . . mentioned in his report," especially his "assessment of the risk" of permitting visitation. He found "what Dr. [Reynolds] . . . appeared to rely upon was the risk of . . . [Rick] physically acting out towards [Bill] and . . . attacking him, . . . as he'd done in the past." Dr. Katz, however, explained that "this is more than a physical abuse

case, this is a coercive control, emotional abuse case, as well," and that "the emotional abuse can be as traumatizing, if not more so, than the physical abuse." Dr. Katz's primary concern "in [his] 2018 report . . . was about [Rick] . . . converting from overt physical attacks into . . . deliberate psychological attacks . . . [and] emotional abuse of [Bill]," and he found the "continued risk . . . was strengthened by the continued reports from numerous different sources of [Rick] acting out towards [Bill]," and "having a negative effect on [him]." Dr. Katz did not "feel that Dr. Reynolds . . . expressed those . . . issues" in his report, noting "Dr. [Reynolds] never met . . . [Bill]." Dr. Katz could not understand "how Dr. [Reynolds] . . . could recommend that it would not harm [Bill] to have contact with [Rick], when he never assessed the issues with [Bill]" or addressed "the issues of the emotional harm and . . . complex trauma that [Dr. Katz] described a[s] . . . having a significant effect on [Bill]."

Dr. Katz also considered and testified concerning Dr. Enright's reports, finding they also did not "address[] th[e] coercive control aspect." Dr. Katz testified anger management "therapy may be helpful to . . . [Rick] in terms of his overall functioning," but Dr. Katz did not "see this closing the gap in those issues . . . that were noted . . . even in late 2018 of [Rick] acting out towards

18

[Bill] when there were . . . phone contacts."  He found Dr. Enright's reports showed Rick was still of the mentality that "h[e was] the victim, . . . [that] h[e] never act[ed] out aggressively to anyone, and that every[one,] . . . including the system[,] has victimized him."

Dr. Katz further explained the reports revealed that Rick's "regret was a regret in terms of . . . how this case has been affecting him."  Dr. Katz testified Rick's state of mind "doesn't get to the root of the problem of [Rick's] victimization of . . . [Bill]," and does not establish that Rick understands "he's caused harm to [Bill], [or that] his pattern of parenting has been destructive [to their] relationship."  Dr. Katz recommended that Rick and Bill "not . . . have visitation until [they] are reassessed and . . . both of them are ready and capable of . . . safe visitation."  Dr. Katz testified that if "visitation occurs [prior] to that happening[,] it could lead to emotional harm for [Bill]."

Dr. Reynolds also testified, and he confirmed "Dr. Katz used . . . standard psychological tests that are used in these types of evaluations," and that Dr. Katz's "evaluation was fairly straightforward in terms of its methodology."  Dr. Reynolds did not dispute Dr. Katz's finding that resumption of visitation would cause emotional harm to Bill; to the contrary, he confirmed he would "have [no] way of knowing whether [Bill] would experience emotional harm from

19

visits[.] . . . without actually evaluating him," and that he opined only "about whether [Rick] is ready for visits." Dr. Reynolds testified only that, based on his review of Dr. Enright's updated reports, Rick was "proceeding in a manner that [Dr. Reynolds] think[s] . . . appropriate, addressing not only [his] trauma but . . . also the anger management and the aggressiveness."

Dr. Reynolds acknowledged that he felt that in 2018 Bill was "at an age where attempting to compel . . . contact would be counterproductive and that services provided to [Bill] should incorporate his wishes for future contact with [Rick], rather than an attempt to coerce him." Dr. Reynolds also testified "visitation should still not be compelled contrary to [Bill]'s wishes." Dr. Reynolds further stated he was not "mak[ing] any kind of recommendation as to whether or not supervised visitation should begin," and that "[his] evaluations of [Rick] suggest[ed] . . . [Rick] wouldn't present a risk of [physical] harm to [Bill] in a supervised setting."

The trial court conducted an in camera interview of Bill in the Law Guardian's presence. Rick's counsel did not object to the interview, and he submitted questions for the court to ask during the interview. The court asked Bill about his "feelings on visiting with" Rick, and Bill said, "[E]very time we ever tried . . . he's always just immediately, like, I tried talking, he just got

20

angry. If there's someone else in the room, he was always paranoid and angry." Bill described his interaction with Rick at the Gamestop store, stating, "I walked up to him . . . and he just started yelling at me." Bill stated that "every time, it's just . . . he's always loud and angry . . . . And if that's still happening, what's the point, if he's not going to . . . go anywhere with it?"

The court informed Bill that Rick's therapist indicated "he's doing better," and the court asked Bill a question submitted by Rick's counsel – whether Bill had "been made aware of the progress that [Rick] has made with his counseling." Bill said he was aware of Rick's progress, but also stated that even if "the counseling . . . progressed in a positive manner," it "probably" would not change his mind about resuming contact with Rick, "because of the phone contact and because the therapist last time . . . still didn't do anything. [Rick] still dropped me off in the woods to harass me, so what's the point?" Based on a request made by the court, Bill agreed to a have a phone call with Rick. The Law Guardian explained Bill did not find the call "productive," and he did not "really want to continue the[m] anymore."

In a detailed written opinion and order, the court determined visitation between Rick and Bill should remain suspended. The court found Drs. Katz and Reynolds testified credibly, but it explained that although both experts testified

21

"regarding how [Rick] may feel about visits and how he is progressing in his counseling," "only Dr. Katz was able to testify about the emotional harm that [Bill] would face if . . . subjected to visit[ation]." The court also noted that Dr. Katz "recommended [against] . . . contact . . . 'if [Bill] is still expressing such fears about [Rick] and/or if [Rick] . . . shows impaired reasoning or parenting.'"

The court found "[t]here was no indication from the evidence presented . . . that [Bill's] position had changed regarding the fear he feels toward" Rick, and that "no one was able to rebut the testimony of Dr. Katz . . . about the trauma [Bill] has experienced and the harm visitation could cause." Further, the court found Bill "still maintained that he did not want to have any visitation with" Rick, and that "[t]he caseworker as well as the Law Guardian indicated to the court that [Bill]'s feeling about visitation with [Rick] had not changed." The court found by clear and convincing evidence that visitation "would cause [Bill] emotional harm." The court later issued a second order dismissing the litigation with the suspension of visitation in place. Rick appeals from the court's orders.

II.

Rick presents two arguments for our consideration. He first contends the court erred by "rel[ying] heavily on Dr. Katz's opinion," which Rick claims was

22

"a net opinion based on stale and unreliable evidence." Rick also asserts the court erred by relying on its in camera interview of Bill because the interview "was not conducted in accordance with the protections afforded by N.J.S.A. 2A:84A-32.4 and New Jersey caselaw." Rick claims the court's failure to comply with the statute's requirements "denied [him] his due process right[s] . . . , [constituting] plain error clearly capable of producing an unjust result." We consider the arguments in turn.[5]

A court's decision to admit evidence "is 'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). We will reverse a court's admission of evidence "only if it 'was so wide of[] the mark that a manifest denial of justice resulted.'" Ibid. (quoting Green v. N.J. Mfrs. Ins., 160 N.J. 480, 492 (1999)).

_____

[5] Rick's challenges to the admissibility of Dr. Katz's opinion testimony and to the court's in camera interview of Bill were not raised before the trial court. We generally do not consider arguments raised for the first time on appeal unless they go to the court's jurisdiction or involve matters of public concern. See State v. Robinson, 200 N.J. 1, 20 (2009); Nieder v. Royal Indem. Ins., 62 N.J. 229, 234 (1973). We consider Rick's arguments here because their resolution is pertinent to a determination of Bill's best interests.

"The net opinion rule 'requir[es] that the expert "give the why and wherefore" that supports the[ir] opinion, "rather than a mere conclusion."'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014) (first alteration in original) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)); see also Townsend v. Pierre, 221 N.J. 36, 55 (2015) ("[A] trial court must ensure that an expert is not permitted to express speculative opinions or personal views that are unfounded in the record."). "For example, 'a trial court may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified.'" Davis, 219 N.J. at 410 (quoting Pomerantz Paper, 207 N.J. at 373). "Therefore, an expert offers an inadmissible net opinion if he or she 'cannot offer objective support for his or her opinions, but testifies only to a view about a standard that is "personal."'" Ibid. (quoting Pomerantz Paper, 207 N.J. at 373).

Rick's claim that Dr. Katz's testimony constituted an inadmissible net opinion concerning the emotional harm Bill will suffer if he is compelled to have visitation with Rick is undermined by the record. Rather than providing "a mere conclusion," Dr. Katz "g[a]ve the why and wherefore" supporting his opinion, ibid. (quoting Pomerantz Paper, 207 N.J. at 372); see Townsend, 221 N.J. at 55,

24

and he "offer[ed] objective support [grounded in the evidentiary record] for his . . . opinion[]," Davis, 219 N.J. at 410 (quoting Pomerantz Paper, 207 N.J. at 373). Dr. Katz explained his opinion was based on: (1) his August 2017 evaluation of Bill and March 2018 evaluation of Rick; (2) his review of the JFS and MVP reports on Bill's progress and Bill's phone contacts with Rick; (3) Division reports detailing Bill's phone contacts with Rick; (4) Dr. Reynolds's evaluations of Rick; and (5) Dr. Enright's reports concerning Rick's counseling. Dr. Katz testified they were "the type[s] of record[s] that[] [are] reasonably relied [up]on by experts in [his] field in forming . . . opinions . . . [regarding] visitation."

Dr. Katz also detailed the reasons for his opinion, explaining that his evaluations revealed Bill had been the victim of Rick's physical and emotional abuse, Bill feared Rick, and Rick's psychological issues created an ongoing risk of emotional injury to Bill if visitation continued. Indeed, Rick's expert, Dr. Reynolds, acknowledged Dr. Katz's evaluations of Rick and Bill were consistent with the standards typically utilized by experts in the field.

Dr. Katz further addressed events and developments following his evaluations of Rick and Bill, relying on Division records, the JFS and MVP reports, Dr. Reynolds's evaluations, and Dr. Enright's reports to support the

opinions he offered at trial.  Dr. Katz noted Dr. Reynolds could not offer an opinion concerning the risk of emotional harm to Bill because Dr. Reynolds did not evaluate Bill, and Dr. Reynolds testified he had no "way of knowing whether [Bill] would experience [future] emotional harm" should visitation be permitted.

As Dr. Katz explained, the evidence supported his opinion and recommendation that Rick and Bill should not have further visitation until they are "reassessed" because they "are [not] ready and capable of . . . safe visitation."  Dr. Katz further opined that "if visitation occurs prior to that happening[,] it could lead to emotional harm for [Bill]."  His testimony did not constitute a "net opinion," and we are convinced the court did not abuse its discretion by either admitting it or relying on it to support its findings of fact and conclusion it is in Bill's best interests to continue the suspension of Rick's visitation.

Rick's claim the court erred by relying on Dr. Katz's opinion because it was based on stale evaluations is without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).  We note only that "the weight to be given to the evidence of experts is within the competence of the [Family Part]," N.J. Div. of Youth & Fam. Servs. v. D.M., 414 N.J. Super. 56, 74 (App. Div. 2010) (quoting LaBracio Fam. P'ship v. 1239 Roosevelt Ave., Inc., 340 N.J.

Super. 155, 165 (App. Div. 2001)), due to "the court's 'special jurisdiction and expertise in family matters,'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). The court was aware of the timing of Dr. Katz's evaluations, but it nonetheless determined his opinion testimony, which was based on the evaluations and other evidence, was credible. The court's determination that Dr. Katz's testimony was credible, and the court's weighing of the testimony, require our deference. Rick offers no basis to conclude otherwise.

Dr. Katz's testimony, which the court found credible, supports the court's determination that resumption of visitation will cause Bill emotional harm. See N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App. Div. 2015) (stating the court's decision "will not be disturbed when there is substantial credible evidence in the record to support the court's findings"). Additionally, the court's determination is supported by Dr. Reynolds's opinion expressed in his July 2018 report that Bill was "at an age where attempting to compel . . . contact," or "attempt[s] to coerce him" into resuming contact, "would be counterproductive," and Dr. Reynolds's testimony at trial that "visitation should still not be compelled contrary to [Bill's] wishes."

In sum, the court's findings are amply supported by credible evidence. The court utilized its "expertise in family matters," Thieme, 227 N.J. at 282-83 (quoting Cesare, 154 N.J. at 413), "ma[d]e first-hand credibility judgments about the witnesses," N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008), and weighed the testimony presented. We discern no basis to upset the court's findings or determination. See K.T.D., 439 N.J. Super. at 368.

## III.

We also consider Rick's claims that the court erred by relying on "its in camera interview of" Bill because the interview "was not conducted in accordance with . . . N.J.S.A. 2A:84A-32.4 and New Jersey caselaw[,]" and the court "denied [Rick] his due process right to confront witnesses." Rick relies on N.J. Div. of Child Prot. & Permanency v. C.W., where we held that "when a Title Nine defendant objects to utilizing a procedure other than presenting a child's in-court testimony, the trial judge must follow the requisites of N.J.S.A. 2A:84A-32.4(a) to [(c)]." 435 N.J. Super. 130, 143 (App. Div. 2014).

Rick's reliance on N.J.S.A. 2A:84-32.4(a) is misplaced. The statute applies only "[i]n prosecutions for . . . abuse or neglect of a child pursuant to [N.J.S.A.] 9:6-3, or in any action alleging an abused or neglected child under . . . [N.J.S.A.] 9:6-8.21 et seq." N.J.S.A. 2A:84-32.4(a) (emphasis

added).  As we explained in <u>C.W.</u>, "when a Title Nine defendant objects to utilizing a procedure other than presenting a child's in-court testimony, the trial judge must follow the requisites of N.J.S.A. 2A:84A-32.4(a) to [(c)]."  435 N.J. Super. at 143.

Rick stipulated to a finding of abuse on April 2, 2018, and, at that time, the court "dismiss[ed] the[] [Title Nine litigation]" and ordered that the case thereafter proceed under Title Thirty.  When the in camera interview took place in May 2019, Rick was not "a Title Nine defendant," <u>see</u> <u>ibid.</u>, and, as a result, N.J.S.A. 2A:84A-32.4 was inapplicable to the court's in camera interview in the ongoing Title Thirty proceeding.

In conducting the in camera interview, the court properly followed the procedure set forth in <u>Rule</u> 5:12-4(b).  The Rule provides that "[t]he testimony of a child may, in the court's discretion, be taken privately in chambers or under such protective orders as the court may provide.  A verbatim record shall be made of any in-chambers testimony or interview of a child."  <u>R.</u> 5:12-4(b).  The trial court exercised its discretion under <u>Rule</u> 5:12-4(b) to interview Bill "privately in chambers," and there is "[a] verbatim record" of the interview.  We find no error or abuse of discretion in either the court's decision to conduct the

in camera interview or in the manner in which it conducted the interview. The court complied with the Rule's requirements, and Rick does not argue otherwise.

We also note that Rick did not object to the in camera interview or the manner in which it was conducted. To the contrary, Rick agreed to the process and supplied the court with questions he requested that it ask Bill. We therefore review the court's decision to conduct the interview, and the manner in which it was conducted, for plain error, see R. 2:10-2, and we find none.

In its decision, the court primarily relied on Dr. Katz's opinion that continuing visitation between Rick and Bill would cause Bill emotional harm. The court's in camera interview yielded little supporting the court's determination to continue the suspension of visitation, and, in its decision, the court cites to the interview only to note that Bill "reluctantly agreed to try one last phone contact." Therefore, any purported error in the manner in which the court conducted the in camera interview – and we find none – was not clearly capable of producing an unjust result. R. 2:10-2.

Any of defendant's arguments we have not expressly addressed are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0319-19T2