# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1387-22
                A-1395-22

S.H.S.,

    Plaintiff-Respondent,

v.

A.B.,

    Defendant-Appellant.

_____

S.H.S.,

    Plaintiff-Respondent,

v.

P.S.,

    Defendant-Appellant.

_____

Submitted March 12, 2023 – Decided April 3, 2024

Before Judges Haas and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket Nos. FV-09-0385-23 and FV-09-0386-23.

Dao Law, LLC, attorneys for appellants A.B. and P.S. (Phuong Vinh Dao, on the joint briefs).

S.H.S., respondent pro se.

PER CURIAM

In these appeals, calendared back-to-back and consolidated for purposes of this opinion, defendants A.B. and P.S.[1] appeal from the December 15, 2022 final restraining orders (FRO) entered against them in favor of plaintiff S.H.S. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

Plaintiff and her husband P.B. were married in November 2021. Defendants in this case are plaintiff's sister-in-law and brother-in-law. A.B. is P.B.'s sister and P.S. is A.B.'s husband. Plaintiff and P.B. lived in defendants' home in Jersey City from October 2021 to February 2022, when they moved to their own apartment.

---

[1] We use initials to protect the parties' privacy and the confidentiality of the proceedings in accordance with Rule 1:38-3(d)(10).

Plaintiff's testimony at the FRO hearing was as follows. On February 25, 2022, defendants came to plaintiff's apartment and told her she had to go with them to their home for her safety. Defendants called her parents in India who told her she had "no option" but to go with them. Upon arriving at defendants' home, her husband and A.B. accused her of having an extramarital affair and interrogated her about a phone call she had made a few weeks before while in defendants' home. They told her they had recorded the phone conversation and it would cost her $5,000 to delete the recording. The next morning, A.B. again interrogated plaintiff about the phone call and accused her of having an affair, which plaintiff denied. Plaintiff, who does not have a driver's license or a car, repeatedly requested to go home or to her aunt's house but was denied. Throughout the interrogation, defendants repeatedly called plaintiff's father, imploring him to make plaintiff tell the truth.

Later that day, plaintiff received notification that someone was trying to access her MacBook without her permission. The interrogation continued and plaintiff maintained her position that she was telling the truth. That evening, plaintiff told defendants she wanted to go home to get books she needed to study for her physical therapy exam. A.B. told plaintiff that she could not leave the

3

house, but that her husband would bring her books. The interrogation continued until around 10:30 p.m., when plaintiff went to bed.

The next day, P.B. and A.B. told her that she could only leave the house if she called her alleged paramour that night and pretended she was alone while they listened in on the conversation. They also said she could only leave the house if she left her phone behind. Eventually, plaintiff agreed to those conditions and left for home with her husband, leaving her phone behind.

At their apartment, plaintiff began vomiting and P.B. called A.B., who told him to bring plaintiff back to her home and not to call 911. P.B. took plaintiff back to defendants' home to pick up her phone before going to plaintiff's aunt's house. When they arrived at defendants' home, plaintiff's phone was not in the bedroom where she had left it. She eventually found it in P.S.'s office, where it was connected to his computer. P.B. then took plaintiff to her aunt's house and took her apartment keys from her.

Plaintiff reached out to P.B. during the next week but was unsuccessful. Defendants told plaintiff and her parents to come to their home on March 5, and plaintiff's parents immediately flew from India. When they arrived, P.B. again confronted plaintiff about the alleged affair. Defendants then showed plaintiff's parents photographs and text messages involving sexual content, which they had

4

taken from plaintiff's phone, allegedly evidencing her affair. When plaintiff tried to speak with P.B. alone, A.B. rushed into the room and spewed insults at plaintiff.

A few minutes later, P.S. presented plaintiff's parents with a document he had prepared outlining the terms of plaintiff's separation from P.B. and demanding money from plaintiff and her father. Defendants told her that if she and her family "[would] not accept their demands, they [would] publish all [her phone's] contents on social media." Defendants further threatened that they would "tell everyone in India about [plaintiff's] character." Among their demands were that plaintiff could not leave the United States until the divorce was final, and the marital property would be transferred to defendants.

Plaintiff's father questioned the payment owed on the marital home, which was listed as $26,000, and P.S. reduced it to $15,000. Plaintiff signed the document under pressure because she was afraid of what defendants would do.

As the divorce proceedings ensued, P.S. hired an attorney to represent both plaintiff and P.B. When the attorney failed to contact plaintiff, she told P.B. she wanted to hire her own attorney. She then received a call from P.B., who threatened to call 911 with the allegations of adultery and publish all of plaintiff's phone contents if she obtained independent counsel.

5

In April 2022, plaintiff's father received another call from P.B., demanding money and threatening to publish plaintiff's phone contents. On April 14, defendants sent the contents of plaintiff's phone to both families in India, including plaintiff's eighty-seven-year-old grandfather.

On July 28, 2022, plaintiff sought and was granted a temporary restraining order (TRO) against A.B. based on criminal coercion, harassment, and cyber-harassment and against P.S. for criminal coercion and harassment.[2] An amended TRO was issued on August 9, 2022.

On September 23, 2022, the court began the FRO hearing on both matters because they arose from the same incident. The hearing continued on November 29, 2022, with both defendants making motions for a directed verdict. The court denied both motions, finding that plaintiff had established a prima facie showing that the elements of harassment, coercion, and cyber-harassment had been satisfied.

On December 15, 2022, Judge Stevie D. Chambers rendered his oral decision on the record. The judge found plaintiff credible because she maintained eye contact, told a consistent story and did not embellish pertinent

_____

[2] Plaintiff was also granted a TRO against P.B., but her application for an FRO was denied as to him.

A-1387-22

parts of her testimony. He also found plaintiff's parents to be credible because they provided logical, detailed and consistent testimony. The judge found both defendants' testimony to be illogical and contradictory. He found not credible A.B.'s testimony that plaintiff handed A.B. her cell phone and that defendants knew plaintiff's password because family members routinely shared their passwords. The judge also noted A.B.'s testimony was illogical and in part, contradicted by P.S.'s testimony.

The court found both defendants had committed predicate acts of harassment and criminal coercion, but not cyber-harassment, and an FRO was necessary to protect plaintiff from further harm. The court noted the contents of plaintiff's personal cell phone were inappropriately retrieved by both defendants and then disseminated to third parties without her consent. The judge found that absent the protection of an FRO, defendants may continue to circulate the personal material. Although the judge noted most of the other six factors under N.J.S.A. 2C:25-29(a) were not applicable to this case, he was persuaded "the predicate act alone" necessitated the issuance of an FRO. Accordingly, the judge entered an FRO against A.B. and P.S.

Defendants raise the following issues for our consideration in both appeals, arguing:

7

POINT I

THE ENTRY OF AN FRO WAS UNSUPPORTED BY SUBSTANTIAL AND CREDIBLE EVIDENCE, AND THE ACTS COMPLAINED OF BY PLAINTIFF DID NOT CONSTITUTE DOMESTIC VIOLENCE SUBJECT TO PROTECTION UNDER THE NEW JERSEY PREVENTION OF DOMESTIC VIOLENCE ACT.

    1.    There was no predicate act of domestic violence, and the trial [c]ourt failed to address the intent element.

    2.    There were no substantial or credible evidence that [A.B.] and [P.S.] inappropriately accessed [p]laintiff's phone nor did they [make] any threats.

POINT II

THERE COULD BE NO CRIMINAL COERCION UNDER N.J.S.A. 2C:13-5(a) BECAUSE TRUTH IS AN AFFIRMATIVE DEFENSE AND THE SEXUAL TEXT MESSAGES BETWEEN PLAINTIFF AND [A.S.] PROVED THAT SHE WAS CHEATING ON [P.B.], AND PLAINTIFF AND HER FATHER FREELY NEGOTIATED THE DIVORCE SETTLEMENT.

POINT III

THE EVIDENCE BEFORE THE TRIAL COURT FAILED TO ESTABLISH THAT AN FRO WAS NECESSARY TO PROTECT PLAINTIFF FROM FUTURE ACTS OF DOMESTIC VIOLENCE.

8

We disagree and affirm for the reasons articulated in Judge Chambers's comprehensive and well-reasoned decision. We add the following comments.

Our review of a trial judge's fact-finding function is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). The trial court's findings of fact are binding "when supported by adequate, substantial, credible evidence." Id. at 411-12. "We review the Family Part judge's findings in accordance with a deferential standard of review, recognizing the court's 'special jurisdiction and expertise in family matters.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016) (quoting Cesare, 154 N.J. at 413). Thus, "we accord great deference to discretionary decisions of Family Part judges." Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012). "We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412).

Legal decisions of family part judges are reviewed under the same de novo standard applicable to legal decisions in other cases. Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019); Amzler v. Amzler, 463 N.J. Super. 187, 197 (App. Div. 2020).

"In adjudicating a domestic violence case, the trial judge has a 'two-fold' task." J.D. v. A.M.W., 475 N.J. Super. 306, 313 (App. Div. 2023) (quoting Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006)). First, the court must "determine whether the plaintiff has proven, by a preponderance of the evidence, that the defendant committed one of the predicate acts referenced in N.J.S.A. 2C:25-19(a)." Ibid. Then, the court must "assess 'whether a restraining order is necessary . . . to protect the victim from an immediate danger or to prevent further abuse.'" Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 475-76 (2011)).

We find unavailing defendants' arguments the record did not establish predicate acts of harassment and criminal coercion and the intent to commit these acts. Plaintiff's credible testimony established defendants accessed her cell phone without her consent and distributed her personal, sexually-oriented text messages and photographs to her family members and acquaintances, and then threatened to publish the information on social media. The judge was entitled to use "common sense and experience" and inferences made from the evidence to determine whether the requisite intent was established, and did so here. H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003).

We also reject defendants' claim that they were entitled to truth as affirmative defense to coercion. It is an affirmative defense "that the actor believed the accusation or secret to be true . . . and that his purpose was limited to compelling the other to behave in a way reasonably related to the circumstances which were the subject of the accusation." N.J.S.A. 2C:13-5(a). Even if the information on plaintiff's cell phone "proved" her infidelity, defendants' coercive use of that information and threats to publish it on social media were in no way reasonably related to any legitimate purpose.

Lastly, we are unpersuaded by defendants' contention the judge erred in his determination a FRO was necessary. The judge acknowledged that many of the factors enumerated in N.J.S.A. 2C:25-29(a) were inapplicable to this case. However, these factors must be evaluated "in the context of whether the defendant is likely to continue his course of abusive behavior." J.D., 475 N.J. Super. at 315. We agree with the judge's assessment that defendants would have continued the publication and threat of publication of plaintiff's personal information, as evidenced by their threats to do so.

To the extent we have not expressly addressed any issues raised by defendants, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(e).

11

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

12