# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3136-23

K.M.,

    Plaintiff-Respondent,

v.

G.M.,

    Defendant-Appellant.

_____

Argued September 22, 2025 – Decided October 7, 2025

Before Judges Sabatino and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FV-02-1755-24.

Yeugenia K. Samardin (Samardin, LLC) argued the cause for appellant.

Marina Ginzburg argued the cause for respondent (Ruiz Doolan Law Firm, LLC, attorneys; Marina Ginzburg, of counsel and on the brief).

PER CURIAM

Defendant G.M. appeals from a May 10, 2024 Final Restraining Order (FRO) entered against him and in favor of his spouse, K.M., following a bench trial in the Family Part.[1]  G.M. argues various trial errors resulted in the entry of the FRO, including a claim that the court relied on body-worn camera (BWC) footage that was not admitted in evidence.  We disagree and affirm.

I.

K.M. and G.M. were married in Russia in 1981 and emigrated to the United States in 1991.  They share three adult children who are all emancipated and reside separately.  Prior to the entry of the temporary restraining order (TRO), the parties resided together in Fort Lee.

According to K.M., the circumstances leading to the entry of the TRO began on January 27, 2024, when G.M. came home from work intoxicated and agitated.  They argued about G.M.'s inability to locate his birth certificate.  The argument escalated when G.M. grabbed her by her shirt and neck and began choking her.  K.M. was able to finally run away into her bedroom and lock the door behind her.  She took photographs of herself depicting bruising and red

---

[1]  We use initials to protect the identity of domestic violence victims pursuant to Rule 1:38-3(d)(10).

2

marks on her neck and breast area, which were admitted into evidence without objection.

On January 28, the following day, both parties engaged in another heated argument in which K.M. accused G.M. of being verbally abusive and increasingly agitated. Concerned that another physical altercation might occur, K.M. contacted the Fort Lee Police Department to report G.M.'s recent episodes of intoxicated and abusive behavior. G.M. appeared to be intoxicated and agitated. Several officers responded to the parties' residence and the parties were interviewed separately, as seen on the officers' BWCs. On the same day, K.M. applied for a TRO, alleging assault arising from the January 27 incident. On January 28, the court entered a TRO.[2] G.M. was served on the same day while at police headquarters.

On February 23, K.M. sought to amend the TRO to add allegations against G.M. She testified that during the January 27 incident, G.M. attacked her despite knowing she was recovering from spinal surgery, causing further post-surgical pain, and that during his arrest the following day, he threatened her in Russian, stating (as translated), "[y]ou will pay for this." She further alleged the

---

[2] The February 23 amended TRO references another amended TRO dated February 16, 2024, which is not part of the record before us.

following: On January 31, G.M. returned to the marital residence to retrieve mail; on February 2, he attempted to call her; and on February 3, he emailed her about recurring health insurance payments. Based on this testimony, the court amended the TRO to include predicate acts of assault, terroristic threats, and harassment; service was effectuated on G.M. by email that same day.

The FRO hearing commenced on March 21 and concluded after five days of testimony. The case was tried with the assistance of Russian language interpreters. K.M., Officer Daniel Munoz, the parties' son, Sam,[3] and G.M. testified.

K.M. testified on the pervasive and regular physical abuse and financial control G.M. asserted throughout the marriage. She explained she had not previously sought a restraining order due to pressure from G.M., who minimized the abuse as "normal." However, the January 27 incident prompted her to finally call police because she feared for her life. K.M. testified this incident occurred approximately eight-weeks after she had undergone neck surgery. She believed G.M. was intoxicated and became angry with her after he was unable to find his birth certificate, which he had been looking for all day. She recalled that he

---

[3] We use a fictitious name to protect the identity of domestic violence victims pursuant to Rule 1:38-3(d)(10).

became frustrated, grabbed her around the neck and began choking her with his hands, causing her to cough and have difficulty breathing. When G.M. tried to grab her shirt and released his grip around her neck slightly, she escaped into her room, quickly gathered her belongings and took photographs, left the apartment, and returned home later that evening.

K.M. further testified that the next day, she believed G.M. was in the apartment and that he was again intoxicated. G.M. demanded she give him her sole credit card, the one she used for groceries and her medical needs, and accused her of overspending. She complied but tried to talk with him and explain that she needed the credit card to pay for post-surgery physical therapy. G.M. refused. Instead, he told her that was her problem and that he wanted a divorce and began to swear at her, stating, "you're the bitch. You're con-bitch motherf[-----]." K.M. described feeling frustrated that she had endured G.M.'s "crap and stuff like that" and him "telling [her] you're nobody," and that "I'm not going to give you [a] penny, you're going to be on the street. You're going to be a bum." Thinking she had endured enough, and afraid for her safety, having only recently had spinal surgery, K.M. stated that is when she decided to contact the police and her two sons.

A-3136-23

K.M. next testified about prior incidents of abuse involving G.M., including incidents from June, August and October 2023. She testified the abuse was a regular occurrence, "[e]verytime my husband had a bad mood, something happened to the rest of his family. . . Something happened in the market. Something happened to his work. I was the trigger." On a separate point, K.M. testified about the contents of the photographs, which were admitted into evidence without objection. Although she had difficulty recalling specific timing of these occurrences, she did recall that she suffered these injuries as a result of her husband hitting her. On cross-examination, G.M.'s counsel questioned the veracity of the evidence given K.M.'s inability to recall specific dates and times related to several prior incidents of abuse.

Officer Munoz testified that he and another officer arrived at the parties' apartment at approximately 1:40 p.m. on January 28 and when they entered, he announced that their BWCs had been activated. He initially interviewed K.M. in the kitchen area while the other officer interviewed G.M., and then they switched. Officer Munoz observed that G.M. "seemed a little comfortable for the situation," however, G.M. admitted he and K.M. had a dispute over his birth certificate and he grabbed her blouse, an admission which was captured on the BWC. He subsequently arrested G.M. and as he was leading him outside, G.M.

6

turned toward K.M. and the adult children and said "something in a different language." He was then transported to police headquarters. Officer Munoz did not observe any marks on K.M. and did not note any in his report.

Sam testified he feared for K.M.'s life, stating "I think if there aren't measures put in place to protect her, that it's going to get worse." Although he was not a witness to the events that gave rise to the TRO complaint, he testified that he witnessed weekly arguments between his parents that often turned physical, and when K.M. called him on January 28, he left his residence within five minutes to meet her. Sam also disputed G.M.'s assertion he had difficulty understanding or communicating in English, recounting the many times he had observed his father communicate in English with his friends, at banks, and at stores.

G.M. denied all allegations of assault. Regarding the events of January 27, he testified K.M. blocked his access to her room where he believed his birth certificate was located and he "probably grabbed her by her T-shirt so [he] could move her" out of the doorway, but did not intend any harm. He denied grabbing K.M. by her neck, striking or choking her. Rather, he testified K.M. started yelling and shouting and became "unstable and aggressive," and he retreated to his own room. He also denied drinking prior to the January 27 incident and

A-3136-23

testified that he went back into his room where he slept. As for the events of January 28, G.M. testified he did not initially see K.M. when he woke up but that after she came home, she "started saying that she wanted a divorce and . . . wants [him] to get, get out of th[e] apartment," and she called him derogatory names. He further testified that he told K.M. "if you want a divorce [,] we'll get a divorce," and because she continued to appear unstable and aggressive, he realizing it was "pointless to talk," retreated into his room and later he heard the police arrive. G.M. stated he was interviewed by police without an interpreter, noting "[he] tried to explain something to the police officer. But because of [his] poor English command, [he] couldn't explain it to him fully." G.M. further testified that at the police station he asked for and was initially denied a Russian interpreter. He was subsequently connected with an interpreter who explained the TRO; "what it meant and what [he] needed to do."

G.M. admitted on cross-examination that as he was leaving the apartment following his arrest, he said to K.M., in Russian, "you'll regret it," but denied saying he would make her "pay for this." He explained his statement referred only to the financial consequences K.M. might face living without him, and denied intending it as a threat of physical harm.

A-3136-23

Throughout the trial, G.M. objected to the admission of the BWC footage, arguing that his statements to police were involuntary and, in the alternative, he was entitled to <u>Miranda</u> warnings and an interpreter.[4] The absence of both <u>Miranda</u> warnings and an interpreter, according to G.M., should have warranted exclusion of the footage as evidence in the civil domestic violence trial. The trial court overruled these objections and admitted thirteen minutes of the body-worn camera footage in evidence.

Following the conclusion of the trial, on May 10, 2024, the court issued a thorough oral decision, concluding K.M. had met her burden of proof and entered a FRO. The court began by addressing jurisdiction and the predicate acts as alleged in the amended TRO complaint: harassment, assault, terroristic threats, and the applicable law with respect to each predicate act.

The court next addressed the credibility of the parties and witnesses, finding K.M. and Sam largely credible. With respect to K.M.'s testimony, the court acknowledged that she had an interest in the outcome of the case, including a potential motivation to gain an advantage in the divorce proceedings. Nevertheless, the court found K.M. to be knowledgeable and credible in her description of the marital history. As to the January 27 incident, K.M. testified

---

[4] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

"with detail and without hesitation, she was able to shape her hands . . . to show where [G.M.]'s hands had been placed around her neck or throat and chest area. And, [it is] consistent with the redness in the pictures in P-2 and P-3." She was emotional, and even tearful at times. The court further stated:

> As to the accuracy of her recollection, I find her to be accurate in the description of the stories. I understand that there may be some questioning as to timing or dates, and as to the timing of the pictures of past history relevant to or related to when the incidents that she spoke about occurred in the past.

With respect to Sam's testimony, the court emphasized Sam's demeanor and admission he had learned a lot from his father, despite the abuse he had witnessed his father perpetrate and his concern for K.M.

The court concluded G.M. was less credible. The court observed that G.M. admitted to police on the BWC footage that he had grabbed K.M.'s shirt, and further considered his demeanor and the inconsistencies between his trial testimony and prior statements. The court also rejected G.M.'s claim that a language barrier had prevented him from understanding or adequately explaining himself to the officers. The court further stated:

> [B]y observing and watching the body camera footage repeatedly. And I watched it multiple times. In fact, G.M.'s command of the English language is good enough to make jokes with the officers. To say to them that if they take him to jail it would be better than the

life he's living there at home. And so I don't find that credible at all.

The court found G.M.'s testimony to be "completely contradictory to what he [told] the officers in the moment, without having had time to prepare, without having had time to think about it," relying on the inconsistencies between his trial testimony and the body-worn camera footage. The court concluded G.M. committed the predicate acts of simple assault and harassment against K.M. on January 27 and 28, 2024 and demonstrated an ongoing danger to K.M., based on the history of domestic violence, threats, and financial control. However, the court did not find the predicate act of terroristic threats occurred because there was no showing of a threat to commit a crime of violence with the purpose to terrorize.

G.M. appealed. In response to G.M.'s argument that the trial court expressly referenced reviewing body-worn camera footage beyond the thirteen minutes played and admitted at trial, the court filed an Amplification pursuant to Rule 2:5-1(b) on June 18, 2025. The court clarified that its reference in the decision to review the BWC footage multiple times was "specifically referring to the portions of the body camera footage played during trial on March 21, 2024." The court stated its "reliance on only those thirteen-minutes of [BWC] footage is portrayed in pages fourteen through sixteen of the [t]rial [c]ourt

transcript o[f] March 21, 2024. The [c]ourt narrated, in detail, the [thirteen] minutes of [BWC] footage which was played during trial and admitted into evidence." The court expressly denied having referenced or relied upon any video beyond the admitted thirteen minutes presented at trial. The court's Amplification was untimely, having been filed more than twenty days following G.M.'s appeal.

As a preliminary matter, we reject G.M.'s assertion that we should not consider the court's Amplification. We do so noting that the Amplification clarifies and refutes G.M.'s argument on appeal that the court based its decision on proofs not in evidence. Accordingly, relaxation of the rule requiring filing within twenty days of an appeal is warranted.[5]

## II.

Our review of a court's grant of an FRO is limited. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are

---

[5] Rule 1:1-2 reads in pertinent part, "[u]nless otherwise stated, any rule may be relaxed or dispensed with by the court in which the action is pending if adherence to it would result in an injustice." The trial court possesses this seldom-invoked reservoir of discretion, which permits it to waive a rule, or a portion of a rule, when strict adherence would otherwise produce an unjust result. Kellam v. Feliciano, 376 N.J. Super. 580, 587 (App. Div. 2005).

'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)).

Deference is particularly warranted where, as here, "the evidence is largely testimonial and involves questions of credibility." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). This is because it is the trial judge who "sees and observes the witnesses," thereby possessing "a better perspective than a reviewing court in evaluating the veracity of witnesses." Pascale v. Pascale, 113 N.J. 20, 33 (1988) (quoting Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)). Therefore, a reviewing court will not disturb a judge's factual findings unless convinced "they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort v. Invs. Ins. Co., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)).

Consequently, "findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015) (citing Cesare, 154 N.J. at 411-12). A reviewing court does

not, however, accord such deference to the court's legal conclusions, which are reviewed de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The entry of an FRO under the Prevention of Domestic Violence Act (PDVA) requires the trial court to make certain findings pursuant to the two-step analysis in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Initially, the court "must determine whether K.M. has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in [N.J.S.A. 2C:25-19(a)] has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)).

If a predicate offense is proven, the judge must then assess "whether a restraining order is necessary, upon an evaluation of the facts set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." J.D., 207 N.J. at 475-76 (quoting Silver, 387 N.J. Super. at 127). Whether a restraining order should be issued depends on the seriousness of the predicate offense, on "the previous history of domestic violence between K.M. and G.M. including previous threats, harassment[,] and physical abuse[,] and [on] whether immediate danger to the person or property is present." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995) (citing N.J.S.A. 2C:25-29(a)).

14

G.M. raises several arguments on appeal. He contends that the trial judge's belated submission violated Rule 2:5-1(b) and underscored the court's inconsistent handling of the police BWC footage. That inconsistency left the record unclear as to whether the judge reviewed thirteen minutes or forty minutes of footage, creating irregularities that warrant reversal. He further argues that the court repeatedly viewed the forty-minute BWC recording off the record, which "mandates reversal of the FRO in the interest of justice" because the decision rested on evidence never admitted at trial.

G.M. further argues that the court's decision is not supported by adequate credible evidence in the record. He contends that the BWC footage formed the basis of the court's credibility determinations and that the court erred by considering his statements shown on the footage. G.M. asserts that the FRO must be reversed in the interest of justice because the parties' son who served as a witness did not witness any of the incidents of domestic violence contained in the TRO. Plaintiff's "version of the events defies logic and is contradicted by the trial record and police [BWC] footage." Finally, due process mandates reversal of the FRO because G.M. was denied a fair trial when the court refused to permit sur-rebuttal testimony of Sam.

A-3136-23

We reject G.M.'s arguments, finding no support in the record for any of his sweeping contentions that the court erred in granting the FRO. Rather, G.M. misapplied the legal standard applicable to the entry of FROs and misread the trial court's Amplification letter. We thus affirm, substantially for the reasons stated by the trial court in its oral opinion and as further amplified by its correspondence on appeal.

First, we address G.M.'s claim that the court viewed, considered, and relied upon BWC footage not admitted in evidence. We reject this speculative and unsupported contention. Although the transcript reflects a single reference to "forty minutes" of BWC footage, the court never indicated that it reviewed anything beyond the thirteen minutes properly admitted into evidence. In fact, G.M. acknowledges the thirteen-minute video was played on the record and marked as an exhibit. We note that our review of the record evidences no reference to any additional BWC footage being played or viewed. We therefore discern the sole reference to forty minutes of footage to be attributed to a mistake or a transcription error. In any case, this issue was squarely addressed and clarified in its Amplification in which the court clarifies that in reaching its decision, it reviewed and referenced only the thirteen-minutes of BWC footage discussed at trial. Thus, G.M.'s claims to the contrary have no basis in the

record.  Moreover, because this argument is repeated throughout his brief and is a common thread in his presentation, we similarly reject this issue as a basis for several of his remaining arguments.

We next turn to G.M.'s contention the court's decision is not supported by adequate, credible evidence.  We reject this argument based on our review of the record which shows the court made specific factual findings that G.M. committed the predicate acts of assault and harassment related to the January 27 and 28 incidents based on the respective statutory provisions.  Under N.J.S.A. 2C:12-1(a)(1), a person commits the disorderly persons offense of simple assault if by "[a]ttempt[ing] to cause or purposely, knowingly or recklessly causes bodily injury to another."

> Bodily injury is defined as "physical pain, illness or any impairment of physical condition."  N.J.S.A. 2C:11-1(a).  Not much is required to show bodily injury.  For example, the stinging sensation caused by a slap is adequate to support an assault.  State v. Downey, 242 N.J. Super. 367, 371 (Law Div. 1988); see also New Jersey v. Bazin, 912 F. Supp. 106, 115 (D.N.J. 1995) ("Even the slightest physical contact, if done intentionally, is considered a simple assault under New Jersey law.").
>
> [N.B. v. T.B., 297 N.J. Super. 35, 43 (App. Div. 1997).]

In support of its findings, the court cited the testimony of K.M. and Sam, which it found largely credible, as well as photographic evidence documenting

17

the plaintiff's injury. The court concluded that the facts and law were properly applied and found it persuasive that G.M. grabbed K.M.'s shirt and, in doing so, attempted to cause or did purposely, knowingly, or recklessly cause her injury.

The court also justifiably found harassment occurred under N.J.S.A. 2C:33-4. The court based its conclusion on plaintiff's credible testimony that she was subjected to striking, kicking, shoving or other offensive touching, specifically being grabbed, and that G.M.'s actions were done, "with the purpose to harass or because he was angry that she didn't have or couldn't find or wouldn't let him find the birth certificate."

Applying our deferential standard of review, we discern no error in the court's findings of fact and conclude G.M. committed acts of simple assault and harassment; both predicate acts under the PDVA. The court's findings were predicated on the substantial credible evidence in the record, including G.M.'s own admission that he grabbed K.M.'s blouse multiple times. Against this backdrop, we have no basis to second guess the court's findings.

Further, having found that G.M. committed predicate acts of domestic violence, the court also correctly concluded the entry of a FRO was necessary to protect K.M. from G.M. Pursuant to Silver, in all cases, "the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set

18

forth in [N.J.S.A. 2C:25-29(a)(1)] to . . . (6), to protect the victim from an immediate danger or to prevent further abuse." 387 N.J. Super. at 126. The court rejected G.M.'s self-serving assertion that K.M. was motivated to obtain an FRO to gain an upper hand in the pending divorce.

Moreover, "[w]hen the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO [under the second prong of Silver] 'is most often perfunctory and self-evident.'" A.M.C. v. P.B., 447 N.J. Super. 402, 418 (App. Div. 2016). See also Silver, 387 N.J. Super. at 126-27.

To the extent we have not addressed a particular argument, it is because either our disposition of the appeal renders it unnecessary, or the argument was without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

19

A-3136-23